SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

v.

CREDIT BANCORP, LTD., Credit Bancorp, Inc., Richard Jonathan Blech, Thomas Michael Rittweger and Douglas C. Brandon, Defendants.

No. 99 CIV.11395RWS.

United States District Court, S.D. New York.

March 26, 2002.

478

Securities and Exchange Commission, Salt Lake City, UT, By Thomas M. Melton, Esq., of Counsel, for Plaintiff.

Securities and Exchange Commission, New York City, By Robert Blackburn, Esq., of Counsel, Local Counsel.

Getty, Keyser & Mayo, Lexington, KY, By Richard A. Getty, Esq., Jason L. Hargadon, Esq., of Counsel, for Defendant Douglas C. Brandon.

## OPINION

SWEET, District Judge.

The Securities and Exchange Commission (the "SEC") has brought this motion for summary judgment against Douglas C. Brandon ("Brandon") pursuant to Rule 56 of the Federal Rules of Civil Procedure. This case involves material misrepresentations regarding a Ponzi scheme in which Brandon represented himself as trustee and sole signatory (the "Trustee") for Credit Bancorp, Ltd. ("Credit Bancorp" or "CBL"). Because there are no disputed issues of material fact and because Brandon's statements and omissions were false and misleading, and he was on notice of their falsity, the SEC's motion is granted.

### Parties and Prior Proceedings

The relevant parties to this action as well as various prior proceedings are described more fully in previous opinions of this court, familiarity with which is presumed. *See SEC v. Credit Bancorp, Ltd.*, 138 F.Supp.2d 512, 517 (S.D.N.Y.2001);

*SEC v. Credit Bancorp, Ltd.,* 194 F.R.D. 457; *SEC v. Credit Bancorp, Ltd.,* 93 F.Supp.2d 475 (S.D.N.Y.2000); *SEC v. Credit Bancorp, Ltd.,* 96 F.Supp.2d 357 (S.D.N.Y.2000); *SEC v. Credit Bancorp, Ltd.* 103 F.Supp.2d 223; *SEC v. Credit Bancorp, Ltd.,* 109 F.Supp.2d 142 (S.D.N.Y.2000); *SEC v. Credit Bancorp, Ltd.,* No. 99 Civ. 11395, 2000 WL 968010 (S.D.N.Y. July 12, 2000); *SEC v. Credit Bancorp, Ltd.,* 194 F.R.D. 469 (S.D.N.Y. 2000); *SEC v. Credit Bancorp, Ltd.,* 2000 WL 1170136.

The instant motion of the SEC was heard and marked fully submitted on December 5, 2001.

## *FACTS*

The facts as set forth below are obtained from the parties' submissions and are not in dispute except as noted.

### I. *The Credit Bancorp Securities Investment Program*

The Credit Bancorp credit facility program was represented to investors as an opportunity to borrow money, using their assets as collateral, at financing rates that were "considerably lower than those charged by major brokerage houses." The program also claimed to remit a "dividend" based on the value of any unencumbered collateral. The amount of the dividend varied, but was generally between four and six percent.

The credit facility purported to offer investors a guaranteed, quarterly dividend in exchange for assigning their securities to Credit Bancorp. Credit Bancorp told potential investors that it earned money by charging interest on loans to other credit facility investors and through "CBL's proprietary investment strategy." Brandon understood this to mean "taking assignments of securities for the purpose of engaging in locked arbitrage in Europe."

Investors were told their securities would be deposited into a Credit Bancorp account to be used in locked arbitrage. By locked arbitrage, Credit Bancorp meant that it would "receiv[e] value on its account" for the investors' securities, and that value would allow Credit Bancorp "to expand its own credit line with its partner banks," which in turn would implement the "CBL proprietary investment strategy."

The Credit Bancorp proprietary investment or trading strategy was supposedly accomplished via Credit Bancorp's unique relationships with its European banking partners. Once Credit Bancorp had investor assets in Credit Bancorp accounts, they were given a "trading line of credit" by an institution. This institution would use the line of credit, on behalf of Credit Bancorp, for intra-day trading.

An investor's participation in Credit Bancorp's program began with the signing of the "CBL credit facility agreement" and a separate "letter of engagement" that was to be executed and sent to a designated Credit Bancorp office. Richard Blech, the president and owner of Credit Bancorp ("Blech"); Brandon; and the investor would sign the engagement letter. This agreement provides that by the execution of this document, a trust would be established under Kentucky law, and Brandon would owe the investor the duties and responsibilities of a trustee as set forth in Ky.Rev.Stat. Ann. § 386.705—386.735.[1]

---

**1.** Section 386.710 of the Kentucky Code states that a trustee shall "observe the standards in dealing with the trust assets that would be observed by a prudent man as defined in Ky.Rev.Stat. Ann. § 386.800(3)." The definition of a prudent man, as defined by Ky.Rev. Stat. Ann. § 386.800(3), is a "trustee whose exercise of trust powers is reasonable ... and in view of the manner in which men of ordinary prudence, diligence, discretion and judg-

The investors would then transfer their securities or other assets to the Trustee to be placed in a Credit Bancorp account. The engagement letter states, "Only [Brandon] as trustee will have signatory or withdrawal power over the account under the terms of the Credit Facility." The majority of the credit facility agreements signed by Credit Bancorp investors stated that the Trustee would have legal title to the assets, and the investor would retain equitable title and beneficial ownership at all times. Article IV, section 4.3 of the sample credit facility agreement provided that, "[n]either CBL nor Trustee will at any time sell, pledge, assign, margin, lien, hypothecate, encumber, or otherwise dispose of the assets except as authorized in this agreement." Credit Bancorp's promotional packet represented that all investor "US Dollars assets" were to be held in U.S. banks or brokerage firms, while other collateral (precious metals, stones, and art) was to be held in Swiss banks. Moreover, the promotional packet stated that assets "cannot be sold or traded by the trustee, unless instructed by [the investor] in writing to do so." [2]

Finally, Credit Bancorp promised to provide the investor with an Evidence of Insurance Certificate to certify that a "Comprehensive Financial Products Policy" in the amount of $500 million was in place, through its insurance brokerage firm, J & H Marsh & McClennan ("Marsh"). The certificate would name each party and identify the assets placed into the trustee account. Credit Bancorp represented that all assets were insured by Lloyd's of London and all custodial risk was covered by the "All Risks Securities Policy" issued by Lloyd's. The insured

party on this policy was listed as being Credit Bancorp Limited. Credit Bancorp represented that the policy covered:

> all risks of physical loss or damage to negotiable and non-negotiable securities and documents of value anywhere in the world, in transit or at rest, including any premises of the Assured (Credit Bancorp Limited) or any clearance system or agency with which the securities are held or deposited, any depository or sub-depository of any such clearance system or agency or subcustodian, from whatever cause arising, to include acts of the insured trustee, including infidelity.

James Hall ("Hall"), the Marsh employee responsible for Credit Bancorp's account, testified that Credit Bancorp's insurance policy consisted of three separate parts: the financial institution bond, the directors' and officers' coverage, and the errors and omissions coverage.

Of course, most of these promises were unfounded. As has been previously held, Credit Bancorp was an elaborate international Ponzi scheme.

## II. *Brandon's Role*

Brandon served Credit Bancorp in numerous capacities. In addition to serving as Trustee, he also was Credit Bancorp's legal counsel and performed other services.

### A. *Brandon's Role as Trustee*

In or around March 1997, Brandon became involved with Credit Bancorp, as Trustee for investors who participated in the credit facility program.

---

ment would act in the management of their own affairs."

**2.** In addition, some potential investors were given documents that clearly stated that the

"assets are held in a type-one (cash) account and cannot be liened, margined, hypothecated, sold short or encumbered in anyway" except by the owner.

A promotional packet delivered to prospective investors included information about Brandon, describing him as having extensive knowledge of "both corporate and securities law." In the packet was a sample credit facility agreement that stated, "CBL will compensate Douglas C. Brandon, Attorney at Law (hereinafter known as 'Trustee') to act as Trustee, to hold assets for the life of the credit facility in a CBL account for the benefit of XYZ and CBL." The agreement also sets forth, in Article 4 section 4.6, that Brandon, as Trustee, "shall subordinate any duty he may have toward CBL or its affiliates in favor of Trustee's fiduciary duty toward XYZ ... should there arise a dispute regarding conflicting claims between XYZ and third parties or CBL as to the assets which are the subject of this Agreement ...."

Brandon made representations to investors as Trustee in writing and in person. Brandon admits that he traveled on at least six occasions on behalf of Credit Bancorp to speak to prospective investors who wished to interview him personally. Brandon addressed customer concerns regarding the safety of their assets and the legitimacy of the Credit Bancorp scheme and explained to them how Credit Bancorp generated income and how he controlled the assets.

Brandon made at least five representations to investors. He claimed that (1) the securities would be put in custodial accounts, (2) he would be the sole signatory on those accounts, (3) he had the power to return the investors' securities, (4) the securities would not be disposed of without the investors' permission, and (5) he was representing the investors' best interests.

### 1. *Custodial Accounts*

Brandon represented to investors that securities would be placed in a custodial trust account. In fact, as part of its scheme, Credit Bancorp maintained at least 37 accounts with a wide variety of financial institutions. Securities and funds were moved among these accounts, in many instances being margined or otherwise encumbered.[3]

Brandon never saw, nor requested to see, any documents to confirm that the accounts were opened in accordance with the engagement letter and the credit facility agreement delivered to investors. He contends he relied on other evidence. First, he relied on documents provided by Blech, delivered to Brandon absent any signature, to confirm his representation that the accounts opened on behalf of investors were indeed custodial accounts and that he was the signatory on those accounts. Second, he claims he relied on conversations with Hall, an employee at Marsh, about the accounts. Yet Brandon conceded that Hall never told him that Marsh was reviewing the third party account-opening documents, and Hall testified that he never confirmed that the accounts were custodial accounts. Hall's testimony is supported by Hobin, a Credit Bancorp salesman, who participated in telephone calls with Brandon and Hall. Hobin admits that neither Hall nor anyone at Marsh ever said they were monitoring investor accounts.

### 2. *Sole Signatory*

Brandon represented that he, as Trustee, would be the sole signatory on all investor accounts. In fact, Brandon was

---

**3.** For instance, in the case of the shares of Vitech America, Inc. ("Vitech"), 40,000 shares were placed into a margin account at Vanguard Brokerage Services; 22,000 shares were placed into a margin account at Salomon Smith Barney; and 33,000 shares placed into a margin account at TD Evergreen.

not the sole signatory on investor accounts, nor a signatory on any but one relatively insignificant account. As noted above, Credit Bancorp maintained at least 37 accounts with a wide variety of financial institutions. The fact that Brandon may have been the sole signatory on one relatively insignificant account is not material given the number of other accounts.

Brandon never verified the claim that he was the sole signatory on any investor accounts. Brandon took no steps to verify that third party institutions had actually received his signature to be used in Brandon's role as sole signatory. Brandon received and relied upon statements generated by Credit Bancorp regarding individual investor accounts, but Brandon never reviewed the underlying documents, including account statements provided by depository institutions, to confirm or validate the authenticity of the Credit Bancorp statements. Brandon takes the position that he relied on Marsh to monitor that he was the sole signatory, even though he admits that no one at Marsh told him they had undertaken this unusual task.

Moreover, Brandon eventually discovered, after attempting to obtain the return of a investor's securities from Bank of New York, that his signature alone was insufficient to secure the release of those securities. In fact, Bank of New York refused even to talk to Brandon about the account. After the second such incident (with a different investor and financial institution), Brandon amended the CBL engagement letter after one of his failed attempts to access a customer's securities. As discussed later, the amendment did little, if

anything, to expand Brandon's authority over the accounts.

### 3. *Power to return securities*

Brandon represented that he had the power to return securities to investors when they requested it in writing. In fact, Brandon did not have the authority to withdraw any securities by himself. Instead, Brandon admits that an independent broker dealer assigned by Credit Bancorp had to execute the transaction. When a customer requested the return of his securities, Brandon would contact another Credit Bancorp employee, either Rittweger or Virginia Allen ("Allen"), who would then request the shares be withdrawn. This procedure was never disclosed to investors or prospective investors.

Brandon admits that, when he requested the return of shares from the Bank of New York, he learned that his signature alone would be insufficient to effectuate the release of the investor's securities and that it required some proof that Credit Bancorp had approved the transaction other than his approval. Brandon never communicated this fact to investors. As discussed in the next section, Brandon on at least three other occasions tried unsuccessfully to obtain the return of an investor's securities. Despite these failures, Brandon continued to represent that he had the power to return securities to investors.

### 4. *Securities would not be sold, etc.*

It is undisputed that Brandon violated the terms of the credit facility agreement and the engagement letter.[4] In almost

---

4. In *SEC v. Credit Bancorp, Ltd.*, 138 F.Supp.2d 512, 517 (S.D.N.Y.2001), the Court determined that Credit Bancorp placed securities in margin accounts and sold investor securities in some cases. The Court also found that the credit facility program was a

Ponzi scheme. The Court-appointed receiver, Carl H. Loewenson, Jr., also confirmed that "Credit Bancorp pledged the deposited securities as security for margin loans." Loewenson Decl., ¶ 6. *See also*, Frost Aff., ¶¶ 11–15.

every case, the credit facility agreement and the engagement letter clearly stated that an investor's securities would never be sold, pledged, or otherwise disposed of without their permission, as long as they did not default on the credit facility agreement. Uncontroverted evidence in this case demonstrates that investors' securities were sold without their permission. Later investors had their shares placed into margin accounts, and margin loans were taken out by Blech to repay earlier investor.

Brandon also promised investors that their securities would not be assets of Credit Bancorp and that they, the investors, would also retain ownership of the securities. Brandon claimed that this would protect investor securities even if Credit Bancorp went bankrupt, because creditors would not have any claim to the investor's securities. This also was not the case.

### 5. *Representing investors' best interests*

Brandon assured investors that he would represent their interests in the protection and recovery of their assets.

Although Brandon was the custodian and protector of Credit Bancorp investor assets, he testified he had no independent responsibility to monitor the investor accounts notwithstanding his status as Trustee. Brandon contends that Marsh, an insurance broker, had agreed to monitor Credit Bancorp's books and records. No corroborative evidence supports this contention. Hall, whom Brandon claims to have relied upon, testified that he never told Brandon that Marsh was auditing Credit Bancorp. Furthermore, Hall stated that he never told Brandon that Marsh had received copies of account statements nor were they reviewing depository institution statements. Every other Marsh employee who was involved with Credit Bancorp also denied ever telling Brandon that Marsh and its employees were monitoring Credit Bancorp.

Brandon took no other internal procedures to ensure that investor accounts and securities were being maintained in accordance with the credit facility agreement. In a letter dated June 19, 1998, Brandon admits that he was not receiving some of the executed engagement letters and trust instructions that were required under Kentucky law to perfect the creation of the trust. Brandon also was aware that assets were not being delivered to him to be placed into the accounts and that they could become a factor with regard to his authority as Trustee, especially if the depository institution "[became] uncooperative or recalcitrant about [the] return of assets."

### B. *Brandon as General Counsel*

Brandon, while Trustee, also served as a lawyer for Credit Bancorp.

Blech identified Brandon as Credit Bancorp's general counsel in internal correspondence. For instance, he distributed a memo to all Credit Bancorp staff in which he stated that "no amendment to the Credit Facility Agreement ... can be made without written authorization from this office and the prior approval of *our counsel,* Douglas C. Brandon." Blech emphasized Brandon's role as Credit Bancorp's counsel three additional times, making it clear to the employees that Brandon was the source of Credit Bancorp's legal advice.

Brandon also represented to others that he was Credit Bancorp's counsel. Brandon stated he was Credit Bancorp's counsel on the engagement letter that Brandon signed in conjunction with the credit facility agreement. In a letter to Kerry Hughes at Citibank, N.A., Brandon identi-

fied himself as Credit Bancorp's legal counsel and opined that Credit Bancorp & Co. was not currently conducting any business in the State of New York. Brandon informed Michael Carroll of the Federal Reserve Bank in Cleveland that he provided "general corporate advisory legal services to CBL and its subsidiaries ...."

Brandon also prepared interoffice memoranda for Credit Bancorp staff that stated the document was "privileged and confidential" because it was an "attorney/investor communication" and "attorney work product."

In his role as legal counsel, Brandon wrote opinions on various securities issues. For instance, Brandon provided Credit Bancorp with legal opinions on the tax ramifications of using the term "income" in the credit facility agreement, the removing of a restrictive legend from stock certificates, and the applicability of various provisions of the securities laws to the credit facility agreement. In a letter from Brandon to Blech, Brandon opined that Credit Bancorp was in compliance with Kentucky law and was exempt from charter or registration requirements in the State of Kentucky.

Brandon, through his legal opinions for Credit Bancorp, provided legal advice to investors and potential investors of Credit Bancorp.[5]

Brandon claims that Credit Bancorp did not seek his authorization to deliver his opinions to investors. Yet, he knew that his opinions were being delivered. He told Hobin that he had prepared the trust agreement based on a legal opinion that they can "assume the investor would rely [on]." This opinion seeks to reassure potential investors that their assets would be safe from creditors of Credit Bancorp, and the investors would be protected by the Lloyd's of London insurance policy if their securities were wrongfully attached. Brandon prepared a similar opinion at the request of Credit Bancorp's sales force, opining that ownership of the securities delivered pursuant to the terms of the credit facility agreement would remain with the investor and not with Credit Bancorp.[6] Brandon also admitted that his opinion removing restrictions was used by third parties on at least three or four occasions. Brandon forwarded the opinion letter to Rittweger, assuming it would be forwarded to prospective investors to rely upon. Furthermore, the self-described "investment bankers" who promoted the credit facility program relied on and referred to Brandon's opinion regarding removing legends from stock certificates in their attempts to attract other investors to the program.

In other cases, Brandon himself contacted prospective investors to answer their questions, including legal queries regarding the credit facility program and Brandon's role as Trustee in relation to the

---

**5.** More specifically, Brandon faxed Thomas Rittweger, Credit Bancorp's Director of Marketing and Administration ("Rittweger"), a copy of the communication Brandon had with a potential investor's counsel, which Brandon was requested to provide them with certain information before they would prepare a legal opinion for their investor, Robb, Peck, McCooey Clearing Corporation. Brandon then asked Glenn Hobin, an employee of CBL, ("Hobin") if he could forward his legal opinion to a potential investors' counsel re-

garding the removal of the restrictive legend from a stock certificate.

**6.** Brandon wrote, "any claims made by other creditors of CBL should fail given the current status of the United States Bankruptcy Laws." Brandon maintained that because Credit Bancorp did "not have fee simple title to the securities under the credit facility contract, then any creditor of CBL could not have rights in excess of or superior to CBL as to those securities."

program. For instance, Brandon contacted one potential investor and assured him that the assets "cannot be sold, pledged or hypothecated without specific instructions from [Brandon] and [he] cannot do so without specific written instructions from the beneficial owner of the assets and the grantor of the trust." On multiple occasions, Brandon provided potential investors with an opinion letter, that stated that removal of the restrictive legend from investors stock certificates presented no legal problem.

Brandon also consented to the use of his opinions by investors. American Security Transfer & Trust, the transfer agent of Colorado Casino Resorts, Inc. ("CCRI"), requested that Brandon allow them to rely on his legal opinion expressed in a letter dated December 2, 1997. Brandon consented to their use of his opinion letter, which stated that any sale of CCRI stock would have to be in accordance with Rule 144 of the Securities Act of 1933.[7] Brandon also authorized some investors, their counsel, and their transfer agents to rely on his legal opinion regarding the credit facility and the application of the securities laws to the program.[8]

### C. *Brandon's Other Roles*

Brandon was also described as General Counsel and Secretary of Credit Bancorp, as well as Secretary and on the Board of Directors of Credit Bancorp (USA), Inc., a subsidiary of Credit Bancorp. In these roles, Brandon received documents on behalf of Credit Bancorp (USA) and Credit Bancorp, Ltd., such as legal bills.

Brandon also was an employee of Credit Bancorp. Credit Bancorp paid his salary, paid for his rent, supplied him with a new computer, and paid all salary and benefits for his legal assistant, Bonnie Bowlin. Brandon would notify other key personnel at Credit Bancorp that he would be taking vacation days in an upcoming week. Also evidencing Brandon's role as a Credit Bancorp employee was his coverage under the directors and officers liability policy, brokered by Marsh.

Brandon solicited business on behalf of Credit Bancorp. In a typical week, Brandon said he spoke to at least one investor or prospective investor. These communications usually dealt with the potential investor's doing due diligence, primarily with regard to the insurance. Brandon also corresponded with existing investors of Credit Bancorp on numerous occasions via mail and fax. These contacts were part of the sales efforts of Credit Bancorp.

Brandon also traveled and participated in presentations soliciting other prospective investors to participate in the credit facility. For instance, Brandon met with the Dallas Teacher's Credit Union ("DTCU") in April 1999, and again in August 1999. Brandon represented that assets delivered into the credit facility were safe, and that Marsh would be monitoring the accounts. In these discussions with the DTCU, Brandon addressed the issue of the safety of the securities placed in the credit facility program. Brandon also represented that Marsh was auditing Credit Bancorp and was monitoring each account at the close of each transaction. In a memo dated September 14, 1999, Hobin

---

**7.** In a letter from Brandon to American Security Transfer & Trust, Brandon states that he needed a new CCRI stock certificate without the restrictive legend, and that upon termination of the credit facility, he would return any shares to them for reissuance with the appropriate legend.

**8.** Brandon provided potential investors with his "Creditor's Rights and Rule 144—Legend Removal" opinion letters, and gave them permission to rely on them for purposes of the credit facility.

forwarded Brandon documents relating to the DTCU. Hobin wanted Brandon to see the progress being made.

### III. *The Treatment of Securities Held Under Brandon's Control*

#### A. *LCA Vision Centers*

In or around the summer of 1997, Stephen N. Joffe ("Joffe") entered into a credit facility agreement with Credit Bancorp and a trust agreement with Brandon. The engagement letter and trust instructions specifically state that Joffe's LCA Vision Centers securities would be deposited into a Credit Bancorp account, on which Brandon was to be the sole signatory.

Joffe later cancelled the deal with Credit Bancorp and requested the return of his shares. Joffe's 950,000 shares were not transferred back to him at his request, even though Blech told Joffe the shares would be there "soon." While Joffe requested that Brandon initiate any legal process necessary to effectuate the return of his securities, Brandon never filed a claim on Joffe's behalf with Marsh, nor did Brandon, in his capacity as Trustee, initiate any legal action against Credit Bancorp.

At the time Joffe requested the return of his securities, Brandon did not know the location of Joffe's shares, or the account number, until he demanded the information from Rittweger. Brandon contacted the Bank of New York, which was supposedly holding Joffe's unreturned shares. Brandon claims that the Bank of New York told him that because he was not an officer or principal of Credit Bancorp, they could not discuss the account with him and he could not transfer Joffe's shares. Prior to this time, Brandon never reviewed the actual account-opening documents at the Bank of New York with regard to Joffe's deposit. Brandon never requested such a document from the bank.

At no time did Brandon request of anyone at Credit Bancorp to provide him with a letter authorizing him to transfer Joffe's securities back to him. Despite Brandon's claimed reliance on Marsh to "monitor" his transactions, there is no evidence that Brandon contacted anyone at Marsh to ascertain the location of Joffe's shares.

On February 19, 1998, Brandon contacted Joffe by telephone and told him his shares would be delivered to Brandon on February 27, 1998. They were not. On March 4, 1998, Brandon asked Rittweger to have the shares returned. On March 19, 1998, Brandon contacted Blech to request again the return of Joffe's shares.

Brandon was never given an explanation as to what happened to Joffe's securities. Other evidence reveals that between January 7 and January 12, 1998, 950,000 shares of LCA Vision were sold out of account number 7085100 at J.P. Morgan, an account belonging to Credit Bancorp.

#### B. *Colorado Casino Resorts, Inc.*

On or about October 22, 1997, Double Eagle Investment, Ltd. ("DEI"), agreed to enter Credit Bancorp's credit facility program. DEI agreed to deliver six stock certificates, representing a total of 5,700,000 shares of Colorado Casino Resorts, Inc. ("CCRI") stock, as collateral for establishing a line of credit with Credit Bancorp. Brandon was the Trustee of the credit facility and was to hold the securities in an insured account for safekeeping as represented in the engagement letter and trust instructions document he signed. The stock certificates were sent directly to Rittweger, instead of to Brandon as stated in the engagement letter.

On or around January 5, 1998, DEI terminated the credit facility and requested the return of the CCRI stock certificates. Brandon, although representing he

was the sole signatory and could withdraw the shares, asked Rittweger to locate the shares. An employee of Credit Lyonnais Securities ("Credit Lyonnais") informed Brandon that two of the six stock certificates, representing 1,900,000 shares, could not be returned to him because Credit Lyonnais did not recognize his authority under the trust agreement.

As with the Joffe shares, Brandon encountered ongoing delays in getting the stock certificates returned. On April 7, 1998, Brandon requested Rittweger find out the status of the share certificates because DEI had not yet received them.

Brandon never asked Citibank representatives if he was indeed the sole signatory on the account as he represented to DEI. He did not request or review any account statements from Citibank on this account. No evidence exists to show that Brandon sought to have Marsh locate the shares, a logical step if one accepts Brandon's claim that Marsh was monitoring all accounts.

After this second incident of being unable to return securities to investors, Brandon required Credit Bancorp to sign the trust agreement. As the next two subsections show, this modification did little to increase Brandon's authority over the accounts. In addition, he did not take any steps to verify that he was the sole signatory on the other depository accounts.

### C. *Vitech America, Inc.*

On February 25, 1998, Wolf Partners LP ("Wolf") entered into a credit facility agreement with Credit Bancorp in which they transferred shares of Vitech America, Inc. ("Vitech") in exchange for a one million dollar loan and a quarterly dividend. In conjunction with the credit facility agreement, Wolf signed an engagement letter and trust instruction document with

Brandon to accept Brandon as the Trustee for the securities.

The engagement letter stated that the securities would not be sold, transferred, pledged, hypothecated, or otherwise disposed of. It listed four Credit Bancorp accounts—at DTC 903, Brown Brothers Harriman, Bear Stearns, and Prudential Securities, Inc.,—where the Vitech securities were to be held. These shares were not to be transferred except in accordance with the credit facility agreement, which did not authorize the unrestricted transfer of the Vitech stock to other accounts. In fact, Wolf's securities were placed in accounts other than those specifically stated in the agreement and were placed in margin accounts that subjected them to risk of being liquidated.

On August 12, 1998, William St. Laurent ("St.Laurent"), the general partner of Wolf, requested that Brandon return 1,515,000 of the 1,815,000 Vitech shares in Credit Bancorp's possession. The rest of the shares would be left in Credit Bancorp's possession to serve as guarantee for the one million dollar loan. On August 13, 1998, Brandon wrote to St. Laurent confirming the request for the return of shares, but Brandon told St. Laurent that Credit Bancorp needed to determine how many shares would have to be kept as collateral for the loan.

Brandon also notified St. Laurent, as well as Blech, that he had prepared the instruction letters to the four custodial institutions named in the engagement letter, instructing them to return the securities to Wolf. On August 25, 1998, Wolf requested copies of the instruction letters from Brandon and sought to confirm that the certificates would be returned during that week, as Brandon had indicated. Brandon faxed Wolf copies of the documents, but instructed Wolf not to contact the institutions directly, "as it [would] delay the return of

the Wolf Partners' shares of Vitech America."

On September 1, 1998, Wolf contacted Brandon upon belief that his securities were not available at the custodial accounts Brandon had represented were being used. Wolf informed Brandon that they had still not received some of their shares and that they considered the shares lost. In response to this letter, Brandon did not ask Marsh to initiate a claim under the insurance policy, nor did Brandon file any claim in court to recover these shares. Instead, Brandon contacted Rittweger, Allen, and Blech regarding the letter. Brandon did not know where the shares were maintained and was forced to rely on Credit Bancorp personnel to identify the correct depository institutions.

Account statements from Vanguard Brokerage Services for the period of July 9, 1998, through July 31, 1998, reflect that 40,000 shares of Vitech stock were being held in a margin account with a cash debt of $479,293.38 during the period when Vitech shares were in the account. Account statements from Salomon Smith Barney for the period of August 1, 1998, through August 30, 1998, show that 22,000 shares of Vitech stock were being held in a margin account that had a closing debt for the period of $502,051.10.

On September 2, 1998, Wolf faxed Blech and repeated its request for the 558,000 shares that Blech had promised he would return to Wolf.[9] On December 3, 1998, Wolf faxed Blech and Brandon again to request the return of the shares that Blech had promised to return.

On August 25, 1999, Blech requested that Deutsche Bank Securities, Inc. ("Deutsche Bank") (previously BT Alex Brown) transfer 140,820 shares of Vitech to another Credit Bancorp account at Commerce Capital (Pershing). On September 17, 1999, Credit Bancorp employees confirmed that 140,820 shares of Vitech had been received by Commerce Capital (Pershing), but they were not delivered to Wolf partners. Further, an account statement from TD Evergreen, for the period of June 1 to June 30, 1999, shows that 33,000 shares of Vitech were being held in a margin account that had margin debt in the amount of $456,678.77. However, Vanguard Brokerage Services, Salomon Smith Barney, Commerce Capital (Pershing), and TD Evergreen were not named in the engagement letter as depository institutions authorized to hold Wolf's securities.

The Vitech shares were finally returned to Wolf after the Stephenson Equity Company ("SECO") deposited Vintage Petroleum, Inc. ("VPI") shares into the credit facility.

### D. *Vintage Petroleum, Inc.*

Charles C. Stephenson, Jr. ("Stephenson"), through SECO, entered into a credit facility agreement with Credit Bancorp on June 22, 1999. Brandon was named as Trustee in that agreement. Stephenson, pursuant to Rittweger's instructions, immediately deposited eight million shares of VPI stock, with an approximate market value of $83.9 million, with Credit Bancorp. According to the agreement, SECO would retain equitable title and ownership over the VPI shares, and Brandon would assume legal title. Credit Bancorp would receive no interest other than a security interest if and only if SECO borrowed against the stock. Brandon signed the agreement, which explicitly indicates that

---

9. On September 2, 1998, Brandon was again made aware that 588,500 shares of Vitech

had not been returned as promised.

Brandon, as Trustee, would "hold the [eight million VPI shares] for the life of the credit facility in a Credit Bancorp account for the benefit of SECO and Credit Bancorp." The agreement also bars both Credit Bancorp and Brandon from selling, pledging, margining, hypothecating, or otherwise disposing of the stock.[10]

Brandon issued an engagement letter and trust instructions on the same day as the agreement, further assuring Stephenson that Brandon would be "the signing attorney-in-fact for all [Credit Bancorp] trustee accounts," and that the VPI shares would be "held by [Brandon] in a [Credit Bancorp] account and may not be sold, pledged, assigned, margined, liened, hypothecated, or otherwise disposed of except as provided for in the [credit agreement]."

Stephenson delivered the eight million shares in four equal parts to four separate brokerage accounts, pursuant to Rittweger's instructions.[11] One of these accounts, at Deutsche Bank, involved considerable encumbrance and frequent trading and transferring of the securities, including extensive margining and option trading. Two million shares were delivered to a margin account in the name of Credit Bancorp at Deutsche Bank on June 25, 1999, then were transferred to a new margin account (under the new ownership of Deutsche Bank), along with a margin debt of $1.9 million from the BT Alex Brown margin account on June 29, 1999. Stephenson's VPI stock was commingled with shares of other stock in the Deutsche Bank account. The Deutsche Bank statement,

ending June 30, 1999, indicates that the VPI stock was valued at about $21.2 million, approximately half of the total equity held in the account. By the end of october 1999, Credit Bancorp had margin loans at Deutsche Bank totaling $15.1 million, and an equivalent amount was transferred out in cash to various bank accounts. The securities contained in the account were used as collateral, during the same period of June through October 1999, primarily for options trading.

Brandon never reviewed any original account statements for the accounts in which Stephenson's securities were being held.

## DISCUSSION

### Summary Judgment is Appropriate

Rule 56(c) of the Federal Rules of Civil Procedure provides that a motion for summary judgment may be granted when "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The Second Circuit has repeatedly noted that "as a general rule, all ambiguities and inferences to be drawn from the underlying facts should be resolved in favor of the party opposing the motion, and all doubts as to the existence of a genuine issue for trial should be resolved against the moving party." *Brady v. Town of Colchester*, 863 F.2d 205, 210 (2d Cir.1988) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 330 n. 2, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (Brennan, J., dissenting)); *see Tomka v. Seiler Corp.*, 66 F.3d 1295, 1304 (2d Cir.1995); *Burrell v. City Univ.*, 894 F.Supp. 750, 757 (S.D.N.Y.1995). If, when viewing the evi-

---

**10.** However, Credit Bancorp did retain the right to transfer the VPI shares to other accounts than those originally agreed upon by the parties, as long as the new accounts were with United States custodian facilities with a credit rating equal to or greater than the original accounts, and written notice was provided to SECO within five business days of the transfer. Despite the transfer of the securities, there is no evidence that Brandon gave the required notice to SECO.

**11.** Credit Bancorp made numerous transfers of the shares out of three of the accounts, excluding only the Deutsche Bank account.

dence produced in the light most favorable to the non-movant, there is no genuine issue of material fact, then the entry of summary judgment is appropriate. *See Burrell*, 894 F.Supp. at 758 (*citing Binder v. Long Island Lighting Co.*, 933 F.2d 187, 191 (2d Cir.1991)).

Materiality is defined by the governing substantive law. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "[T]he mere existence of factual issues—where those issues are not material to the claims before the court—will not suffice to defeat a motion for summary judgment." *Quarles v. General Motors Corp.*, 758 F.2d 839, 840 (2d Cir.1985).

For a dispute to be genuine, there must be more than "metaphysical doubt." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505 (citations omitted).

Summary judgment is appropriate here because the facts material to the resolution of this matter are not in dispute, and the SEC is entitled to judgment as a matter of law. The facts material to the complaint against Brandon pertain to misrepresentations he made to investors concerning securities or other property invested, and the subsequent fate of those securities due to Brandon's misrepresentations. It is undisputed that Brandon promised to act as a trustee when managing investor custodial accounts. He promised that the securities would be put in custodial accounts, of which he would be the sole signatory, and the he would have the power to return the securities to investors. Further, he pledged that the securities would not be disposed of without the investors' permission, and that he was representing the investors' best interests. The undisputed facts reveal that he acted recklessly in the extreme after a series of events should have shown him that these representations were false.

### Brandon Violated the Antifraud Provisions of the Securities Laws

Section 17(a) of the Securities Act prohibits the making of any untrue statement of material fact or failing to disclose the existence of a material fact in connection with the offer or sale of a security. 15 U.S.C. § 77q(a)(1), (2), (3). Section 10(b) of the Exchange Act, and Rule 10b–5, promulgated thereunder, prohibit similar conduct in connection with the purchase or sale of a security. 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b–5.

Brandon has violated these antifraud provisions of the federal securities laws by making material misstatements, with the requisite scienter, about Credit Bancorp's trust and credit facility agreement in connection with the purchase or sale of securities.

In order to be liable for securities fraud, a defendant must have made a material misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent device; with scienter; in connection with the purchase or sale of a security. *SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999). The standard for violations of Section 17(a)(1) and Section 10(b) and Rule 10b–5 promulgated thereunder are essentially the same.

The SEC does not need to prove investor reliance, loss causation, or dam-

ages in an action under Section 10(b) of the Exchange Act, Rule 10b–5, or Section 17(a) of the Securities Act. *E.g., SEC v. North Am. Research & Dev. Corp.,* 424 F.2d 63, 84 (2d Cir.1970) (reliance not an element of a Rule 10b–5 claim in the context of an SEC proceeding); *Berko v. SEC,* 316 F.2d 137, 143 (2d Cir.1963) (reliance, loss causation and damages not relevant because "[t]he Commission's duty is to enforce the remedial and preventive terms of the statute in the public interest, and not merely to police those whose plain violations have already caused demonstrable loss or injury"); *N. Sims Organ & Co. v. SEC,* 293 F.2d 78, 80 n. 3 (2d Cir.1961) (reliance is not an element of an SEC claim under Section 10(b) of the Exchange Act or Section 17(a) of the Securities Act); *SEC v. Todt,* 2000 WL 223836, at *10 (S.D.N.Y. Feb. 20, 2000) ("the SEC need not prove actual reliance in an enforcement action"); *aff'd,* 7 Fed.Appx. 98 (2d Cir.2001); *SEC v. Norton,* 1997 WL 611556, at *3 n. 2 (S.D.N.Y. Oct.3, 1997) (proof of justifiable reliance and damages are not required in an SEC enforcement action).

 Additionally, the evidentiary standard applicable in a civil enforcement action is a preponderance of the evidence. *Steadman v. SEC,* 450 U.S. 91, 95, 101 S.Ct. 999, 1004, 67 L.Ed.2d 69 (1981); *SEC v. Moran,* 922 F.Supp. 867, 888 (S.D.N.Y. 1996). "The majority of lower courts which have addressed this issue have determined that in civil enforcement actions the proper standard of proof is preponderance of the evidence." *Id.* For example, while the SEC must demonstrate that Brandon knew, should have known, or was reckless in not knowing, that he was committing fraud, the burden of proving scienter also remains a preponderance of the evidence. Additionally, an action based upon circumstantial evidence is not any

less sufficient than one based on direct evidence, *Michalic v. Cleveland Tankers, Inc.,* 364 U.S. 325, 330, 81 S.Ct. 6, 11, 5 L.Ed.2d 20, (1960), and does not necessitate a higher standard of proof, *SEC v. Moran,* 922 F.Supp. 867, 888 (S.D.N.Y. 1996).

### The Misrepresentations Were In Connection With the Purchase or Sale of Securities

 Liability will only exist where misrepresentations are made in connection with the purchase or sale of securities. Brandon has advanced the narrow position that actionable claims only lie if a misrepresentation or omission relates to the actual security itself. Brandon claims that since he did not make any false claims about customer securities, he is therefore absolved from liability under the federal antifraud statutes. The courts have rejected this argument.

In *Rubin v. United States,* 449 U.S. 424, 101 S.Ct. 698, 66 L.Ed.2d 633 (1981), the Supreme Court recognized that "obtaining a loan secured by a pledge of shares unmistakably involves a 'disposition of [an] interest in a security, for value.'" 449 U.S. at 429, 101 S.Ct. 698. The Court continued, "[t]reating pledges as included among 'offers' and 'sales' comports with the purpose of the [Securities] Act and, specifically, with that of § 17(a). We frequently have observed that these provisions were enacted to protect against fraud and promote the free flow of information in the dissemination of securities." 449 U.S. at 431, 101 S.Ct. 698.

 The "in connection with" factor has been broadly construed. *SEC v. Hasho,* 784 F.Supp. 1059, 1106 (S.D.N.Y. 1992), *citing Superintendent of Insurance v. Banker's Life and Casualty Co.,* 404 U.S. 6, 12, 92 S.Ct. 165, 169, 30 L.Ed.2d 128 (1971). "Any statement that is reason-

ably calculated to influence the average investor satisfies the 'in connection with' requirement of Rule 10b–5." *Hasho,* 784 F.Supp. at 1106, *citing SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 861–62 (2d Cir.1968), *cert. denied,* 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969); *accord SEC v. Savoy Indus., Inc.,* 587 F.2d 1149, 1171 (D.C.Cir.1978), *cert. denied,* 440 U.S. 913, 99 S.Ct. 1227, 59 L.Ed.2d 462 (1979). Brandon's statements regarding the custody of investor funds and securities were calculated to influence investors and cause them to place their securities in the hands of Credit Bancorp.

Brandon claims that the fraudulent activities occurred in a separate transaction—the sale or margin of the pledged securities—from the actual pledge itself. This parsing of the transaction fails since it does not take into account that Brandon himself promised investors that their securities would be held in segregated accounts under his control, a representation he knew or should have known to be false based on the facts found above. In fact, rather than safeguarding investor securities as he had promised to do, he allowed the securities to be margined or sold by Blech. Brandon's false promise to investors, made with scienter, cannot be separated from the subsequent pledge or sale or other liquidation of investors assets placed under the control of Credit Bancorp. The uncontested facts prove that the assets were not held in custodial accounts and investor securities were sold or margined. Brandon can cite to no authority limiting the application of the antifraud provisions only to the value of the underlying securities themselves.

**Brandon's Misrepresentations Were Material**

▮▮▮▮▮ Summary judgment on matters of materiality in a securities fraud case is appropriate when the omissions and misrepresentations in question are "so obviously important to the investor, that reasonable minds cannot differ on the question of materiality." *SEC v. Research Automation Corp.,* 585 F.2d 31, 35 (2d Cir. 1978), *quoting Johns Hopkins University v. Hutton,* 422 F.2d 1124, 1129 (4th Cir. 1970). The misrepresentations made by Brandon together with his failure to disclose significant facts, were so central to the Credit Bancorp scheme that there can be no question as to their materiality.

Brandon admits that he made representations to investors regarding the placement of their securities into a custodial trust account, that he never received a single account statement, that he never saw account opening documents on virtually any of the accounts, and that he had no knowledge of the whereabouts of any of the securities. Even after the litigation was filed, he did not know if the securities deposited under his sole control were safe.

Brandon was unsuccessful in his efforts to track the existence of any established custodial trust, yet he continued to tell investors that an established trust did exist. These misrepresentations are material because they affected the investor's "total mix" of information, and because the misrepresentation would play a role in the investor's decision to invest or not.

Brandon admits that the securities were not placed in custodial accounts and that he lacked signatory authority over any of the accounts. Though Brandon contends that no evidence exists that the safety of their pledged securities was an important factor in customers' decisions to invest in Credit Bancorp, there is no dispute that potential investors would want to know if their stocks were placed in risky margin accounts and that their trustee did not in fact have control over their assets.

Brandon acknowledges that he could not return securities to the investors requesting them. This fact too is material, because whether or not the trustee has authority to return the investor's securities affects a customer's decision to invest. Investors would expect to be able to obtain their securities on demand—and would want to know that they would be unable to do so.

Brandon also represented that investors' securities would never be pledged, sold, or disposed of without their permission. This information is critical to any investor. For instance, Brandon wrote a letter to Charles Stephenson ("Stephenson") on November 5, 1999, to assure Stephenson that his assets had not been pledged,[12] and he knew this information was important to Stephenson.

Finally, Brandon represented to investors and potential investors, that he would owe to them and to the securities or other property of the trust, the duties and responsibilities of a trustee detailed in KRS § 386.705–386.735. This was material because it deals with the very nature of the trust agreement between Brandon and the investor. Brandon contends that the position of the Trustee was insignificant to the customer transactions. The record fails to support this contention. The marketing materials, the correspondence between Brandon and the customers, and Brandon's course of conduct all underscore the critical role of the Trustee. Brandon had extensive contact with investors and their counsel and was in daily contact with Credit Bancorp personnel. In addition, as the experience of some defrauded customers shows, Brandon was the individual they turned to, unsuccessfully, to recover their assets.

Brandon's misrepresentations are therefore material as a matter of law. *See, e.g. SEC v. Research Automation Corp.,* 585 F.2d 31, 35 (2d Cir.1978), *quoting Johns Hopkins University v. Hutton,* 422 F.2d 1124, 1129 (4th Cir.1970).

### Brandon Had the Requisite Scienter

 The facts relating to Brandon's knowledge of the Credit Bancorp scheme are not in dispute. The parties agree on the evidence and the legal standards governing scienter. What separates the parties in this case is not an issue of fact, but how the law should be applied to those facts. However, under any interpretation of these facts, the preponderance of the evidence reveals that Brandon knew, should have known, or was reckless in not knowing that his statements to investors were false.

Brandon asserts that he did not know he was not the signatory on the depository accounts; that he did not discern any problems with Credit Bancorp's operation and he relied on the statements of Credit Bancorp representatives; and that he was in control of the accounts. Even if this version of the facts is accurate, at a minimum, Brandon made false statements to investors that he would assume the duties of Trustee under the Credit Bancorp Facility Agreements and Engagement letters. The duty to protect the customers' assets was non-delegable, was not performed, and at the time of the making of the representations, Brandon knew he did not have the capacity to perform. In addition, Brandon continued to represent that he had the authority to return investors' securities to them even after failing on more than one occasion to be able to do so.

 The conscious avoidance of knowledge constitutes sufficient scienter under the federal securities laws. *SEC v.*

**12.** In fact, the stock had already been placed into a margin account.

*McNulty,* 137 F.3d 732, 737 (2d Cir.1998). "Where a defendant plays a central role in marketing an investment, his defense that he was unaware that the investment was a fraud is less credible." *SEC v. Milan Capital Group, Inc.,* 2000 WL 1682761, *5 (S.D.N.Y.2000) (summary judgment granted against salesman who claimed he was duped). *See also SEC v. Infinity Group Company,* 993 F.Supp. 324, 330 (E.D.Pa. 1998); *Meadows v. SEC,* 119 F.3d 1219, 1226 (5th Cir.1997). "Those who hold themselves out as professionals with specialized knowledge and skill to furnish guidance cannot be heard to claim youth or inexperience when faced with charges of violations of the anti-fraud provisions of the federal securities laws." *SEC v. Hasho,* 784 F.Supp. 1059, 1108 (S.D.N.Y. 1992), *citing Ramey Kelly Corp.,* 39 S.E.C. 756 (1960). Brandon played a central role in the fraud. Not only did he market the customers to deposit their assets with Credit Bancorp, but he acted as the trustee charged with the safekeeping of those assets. As trustee, he had the duty to ensure that the representations he made to customers regarding his signatory authority over the custodial account and the protection of those assets were accurate. Brandon knew, or should have known, that his representations were false.

Brandon argues "it was apparent to him that he was the sole signatory of customer accounts." Yet he admits he did not see the account opening documents for most of the accounts, and that he never requested these documents. He also admits that he never received statements on these accounts—statements that would have, in a single glance, provided evidence that customer assets had been margined or sold. He further admits that no one told him he had signature authority. The best he can claim is that no one told him he did not. That is insufficient. In every instance cited by any party, Brandon had to turn to Credit Bancorp for any information relating to investor securities.

Moreover, Brandon lacked control over the accounts, and he knew it. He admits that he "was required to direct his request to a Credit Bancorp employee or an independent broker, along with Brandon's instructions and customer authorization, to effectuate a trade, sell or transfer of the customer's securities."

Even if these factors are not by themselves sufficient as a matter of law to prove scienter, as soon as Brandon tried—and failed—to obtain the return of investors' securities, he should have known that any representations afterward to the contrary were false. Brandon cannot point to a single instance where a depository institution returned shares at his direction. In fact, he often turned to Rittweger or Blech as a matter of course to return the assets. Yet he continued to represent, falsely, that he had authority over the accounts. He had no excuse for this behavior.

Brandon's mere amendment to the Credit Facility Agreement after he was unable to obtain the LCA Vision Center shares belonging to Joffe was insufficient. This alteration failed to vest him with any greater knowledge of or authority over the accounts over which he held putative control. He claims counterfactually that he "did not experience any problems in executing transactions" after the amendment. Yet the SEC has detailed his subsequent desperate efforts to obtain control over the CCRI and Vitech shares.

In short, numerous instances should have alerted Brandon to the irregularity of Credit Bancorp's operations, yet he simply ignored them. While Brandon seeks to minimize these events, he does not deny them. He admits that he simply accepted Credit Bancorp's excuses without under-

taking any independent investigation whatsoever.

In response to the SEC's allegations that he failed to perform meaningful due diligence, Brandon recites a litany of others who were duped by Credit Bancorp. This argument is irrelevant to Brandon's scienter. The question is not whether he was "duped" into believing Credit Bancorp's misrepresentations, but whether, as Trustee, he should have reasonably known otherwise. At the very least, Brandon's actions were reckless as a matter of law when he failed to act after being unable to obtain investors' securities and continued to represent that he had the authority to do so.

Brandon was obligated to maintain the trust in accordance with Kentucky law, which required him to handle the assets in a way that "men of ordinary prudence, diligence, discretion, and judgment would act in the management of their own affairs." Over time, Brandon knew his representations regarding the trust were untrue. Brandon's conduct was, at a minimum, reckless in the extreme.

### *Sanctions are Appropriate*

Permanent injunctions against future violations of the securities laws may be granted on the SEC's motion for summary judgment. *SEC v. Murphy,* 626 F.2d 633, 655 (9th Cir.1980); *SEC v. Bonastia,* 614 F.2d 908 (3d Cir.1980); *SEC v. Research Automation Corp.,* 585 F.2d at 33, 34; *SEC v. Benson,* 657 F.Supp. 1122 (S.D.N.Y.1987); *SEC v. Gallard,* 1997 WL 767570, at*4 (S.D.N.Y. December 9, 1997); *SEC v. Militano,* 1994 WL 285472, at*6 (S.D.N.Y. June 23, 1994).

Having demonstrated a pattern of repeated conduct, courts have broad discretion in looking "beyond the mere facts of past violations and demonstrate a realistic likelihood of recurrence." *SEC v.*

*Commonwealth Chemical Securities, Inc.,* 574 F.2d 90, 100 (2d Cir.1978). In *SEC v. Universal Major Industries,* the court outlined several factors to consider when determining the likelihood of recurrence, including: (a) the degree of scienter involved, (b) the isolated or recurrent nature of the infraction, (c) the defendant's recognition of the wrongful nature of past conduct, and (d) defendant's ability to commit future violations. 546 F.2d 1044, 1048 (2d Cir.1976); *SEC v. Monarch Funding Corp.,* 1996 WL 348209 *10 (S.D.N.Y. June 24, 1996).

Brandon solicited investors without any investigation and with reckless disregard for the falsity of his claims. Even after he discovered that investor securities had been disposed of without his knowledge or consent and that his authority as trustee was not recognized by depository institutions, Brandon continued to make the same representations.

Brandon's lack of recognition that he did anything wrong supports the need for injunctive relief in this case. A persistent refusal to acknowledge culpability is a factor in determining whether to impose injunctive relief. *SEC v. McNulty,* 137 F.3d 732, 741 (2d Cir.1998); *SEC v. Lorin,* 76 F.3d 458, 461 (2d Cir.1996). Brandon denies any wrongdoing. He claims that his reliance on Credit Bancorp and on Marsh were sufficient to meet his obligations as Trustee. Brandon fails to recognize that his participation and representation as Trustee were instrumental to the success of the scheme.

Brandon also contends that he is too old and infirm to be enjoined. Yet a mere two years ago he was sufficiently healthy to maintain a thriving business working for Credit Bancorp. Currently he is practicing law in Lexington, Kentucky.

█ The "mere cessation of illegal activity does not *ipso facto* justify the denial of an injunction." *SEC v. Universal Major Industries Corp.*, 546 F.2d 1044, 1048 (2d Cir.1976), *citing SEC v. Management Dynamics, Inc.*, 515 F.2d 801, 807 (2d Cir.1975). One of the most important factors identified by the Court is whether the violation was an "isolated occurrence" or whether it constituted systematic wrongdoing. Here, Brandon's conduct occurred in the face of numerous red flags over a period of more than two years. *SEC v. Milan Capital Group*, 2000 WL 1682761, (S.D.N.Y.2000); *SEC v. Benson*, 657 F.Supp. 1122, 1133 (S.D.N.Y.1987). Brandon is therefore permanently enjoined.

Brandon misstates the law when he argues that the Court cannot impose a civil penalty [13] if it does not impose a disgorgement remedy. As support for his assertion, Brandon cites the case of *SEC v. McCaskey*, 2001 WL 1029053 (S.D.N.Y. 2001). In that case, however, the SEC requested that the Court defer the quantification of the amount of a penalty until after the amount of disgorgement had been determined. The SEC is making precisely the same request here. The Honorable Shirley Wohl Kram in the *McCaskey* decision did not hold, however, that the SEC could not obtain a civil penalty unless it obtained disgorgement. The two remedies are independent of one another. *See also SEC v. Milan Capital Group*, 2001 WL 921169 (S.D.N.Y.2001).

Therefore, Brandon will be held liable for a civil penalty, but the quantification of that amount will be delayed pending the submission of additional evidence submitted by the parties.

---

**13.** Under Section 20(d)(2) of the Securities Act, and Section 21(d)(3) of the Exchange Act, the SEC may seek civil penalties for violations of the federal securities laws. 15 U.S.C. § 77t(d)(2); 15 U.S.C. § 78u(d)(3).

*Conclusion*

The SEC motion for summary judgment is granted.

Settle judgment on notice.

It is so ordered.