SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

v.

**CREDIT BANCORP, LTD., Credit Bancorp, Inc., Richard Jonathan Blech, Thomas Michael Rittweger, and Douglas C. Brandon, Defendants.**

No. 99 Civ. 11395.

United States District Court, S.D. New York.

Sept. 13, 2010.

Order Adhering to Opinion Sept. 30, 2010.

Securities and Exchange Commission, by Thomas M. Melton, Esq., Salt Lake City, UT, Securities and Exchange Commission, by Robert Blackburn, Esq., New York NY, for Plaintiff.

Thomas Rittweger, Fort Dix, NJ, pro se.

## OPINION

SWEET, District Judge.

Defendant Thomas Rittweger, *pro se,* ("Rittweger" or the "Defendant") has moved for declaratory judgment to bar the plaintiff Securities and Exchange Commission ("SEC" or the "Plaintiffs") from prosecuting this action against him, in view of the criminal prosecution against him resulting in his incarceration and the imposition of an order of restitution in the amount of $18,128,599.40. Upon the conclusions set forth below, the motion of Rittweger is denied.

The SEC has moved under Rule 56, Fed.R.Civ.P. for summary judgment against defendant Thomas Michael Rittweger ("Rittweger" or the "Defendant") for violation of Section 17(a)(1), (2) and (3) of the Securities Act of 1933 ("Section 17(a)") (15 USC § 77q(a)(1), (2)); the Defendant violated Section 10(b) of the Securities and Exchange Act of 1934 ("Section 10(b)") (15 USC § 78j(b)) and Rule 10b–5 thereunder ("Rule 10b–5") (17 C.F.R. § 240.10b–5); a permanent injunction against future violations of these statutes; disgorgement; and a civil monetary penalty. Upon the findings and conclusions set forth below, the motion of the SEC is granted.

## I. *Prior Proceedings*

The SEC filed this action on November 17, 1999, a Temporary Restraining Order, Asset Freeze and Order to Show Cause on November 17, 1999. *SEC v. Credit Bancorp, Ltd., et al.,* 99 Civ. 11395, Docket No. 3.

On January 24, 2000, an Order was entered appointing Carl H. Loewenson, Jr., as Receiver (the "Receiver") for Credit Bancorp and all its subsidiaries and affiliated entities. *Credit Bancorp,* 99 Civ. 11395, Docket No. 87. Pursuant to the Order, the Receiver was granted control of Credit Bancorp's assets, files, and records. *Id.*

On September 7, 2001, this Court awarded Summary Judgment against defendant Richard Blech ("Blech"). *Credit Bancorp,* 99 Civ. 11395, Docket No. 753.

On January 31, 2002, Rittweger was indicted in the Southern District of New York on counts of Conspiracy to Defraud the United States, Securities Fraud, Wire Fraud, and Racketeering. *USA v. Blech, et al.,* 02 Cr. 122, Docket No. 8.

On March 28, 2002, this Court awarded Summary Judgment against Douglas Brandon ("Brandon"). *Credit Bancorp,* 99 Civ. 11395, Docket No. 832.

On June 26, 2003, in the parallel criminal case, Rittweger was found guilty of four counts of Conspiracy to Defraud the United States, two counts of Securities Fraud, two counts of Wire Fraud, and two counts of Racketeering. *Blech,* 02 Cr. 122, Docket No. 110. On June 28, 2005, in the parallel criminal case, Rittweger received a sentence of 135 months and was ordered to pay restitution of $18,128,599.40 and a special assessment of $1,300.00. *Blech,* 02 Cr. 122, Docket No. 192. On August 4, 2005, in the parallel criminal case, the Court issued an order requiring Rittweger to surrender to the Bureau of Prisons on October 28, 2005. *Blech,* 02 Cr. 122, Docket No. 224. Rittweger surrendered for imprisonment on January 27, 2006 to serve his time at the Federal Correctional Institution in Fort Dix, New Jersey. *Blech,* 02 Cr. 122, Docket No. 239.

Through his prison sentence, Rittweger continues to appeal to the court, including a petition for writ of habeas corpus, denied by the Honorable Noel L. Hillman of the U.S. District Court of New Jersey on July 29, 2009 for lack of jurisdiction. *See Rittweger v. United States,* 09 Civ. 3514, 2009 WL 2390600 (D.N.J.) at Docket # 2.

In response to his denial, Rittweger submitted a letter to Judge Hillman on August 17, 2009 requesting to either stay the matter for further consideration or appeal the decision of the court. Letter from Thomas Rittweger, Defendant to The Honorable Noel L. Hillman, U.S. District Judge (Aug. 12, 2009). *Id.* at Docket # 4.

On September 2, 2009, Judge Hillman issued an order to reopen Rittweger's petition for a writ of habeas corpus. Order Reopening Case. *Id.* at Docket # 5. To date, no decision has been made.

On October 28, 2009, the SEC submitted the present motion for summary judgment. On February 22, 2010, Rittweger submitted the present motion for declaratory judgment. Both motions were considered fully submitted on June 5, 2010.

## II. *The Facts*

The facts are set forth in the SEC Statement of Undisputed Facts and are challenged by letters of Rittweger dated June 3 and 21, 2010.

Rittweger, age 50, is a resident of New Jersey. He is currently held as an inmate in the Federal Correctional Institution in Fort Dix, New Jersey, beginning on January 27, 2006 and sentenced to 135 months. *USA v. Blech, et al.,* 02 Cr. 122, Docket No. 239. Rittweger formerly held the title of Managing Director for North America of Credit Bancorp, Ltd.

Beginning in 1997 Credit Bancorp began contacting individuals, such as chairmen and chief executive officers of public companies, to solicit their investment in Credit Bancorp's "Insured Credit Facility Program." Solicitation for this program was done through Credit Bancorp employees as well as representatives that were not employed directly by Credit Bancorp. The insured credit facility program was represented to investors as providing an investment opportunity to high net worth individuals with a minimum investment of $250,000.

Investors could borrow money at financing rates substantially lower than competing brokerage houses using a variety of assets as collateral. Additionally, investors were given the opportunity to earn a "dividend" based on the value of their unencumbered collateral. This dividend was in addition to the normal dividends or interest earned on the collateral asset. The amount of the promised "dividend" generally ranged from four to six percent.

Participation in Credit Bancorp's credit facility program began by submitting the proposed collateral for approval to a Credit Bancorp representative. Once the collateral was approved, Credit Bancorp instructed the investor to execute and send to a designated Credit Bancorp office two documents: the "CBL Insured Credit Facility Agreement," which was the contractual agreement laying out the terms of the credit facility program, and a separate "Letter of Engagement," which engaged the trustee. The investors would then transfer their securities or other assets to Credit Bancorp to be placed in a Credit Bancorp account pursuant to specific directions in the Letter of Engagement. Often, securities were transferred directly to Rittweger pursuant to the instructions in the Letter of Engagement.

Credit Bancorp would direct investors to remove the restrictive legends on their securities. Credit Bancorp told investors that the U.S. dollar assets placed in trust would be transferred electronically to a Credit Bancorp custodial account in a U.S. money center bank, which was rated AA or better by Moody's Investor Services.

Credit Bancorp told investors that Lloyd's of London would insure all assets pledged by investors for $500 million per loss.

The "CBL Insured Credit Facility Agreement" stated that "[n]either CBL nor the Trustee will at any time sell, pledge, assign, margin, lien, hypothecate, encumber, or otherwise dispose" of an investor's assets. The Engagement Letter from Brandon stated; "[o]nly I as trustee will have signatory or withdrawal power over the account under the terms of the Credit Facility...." Rittweger also represented to investors that securities and assets deposited with Credit Bancorp would not be transferred, disposed of, or otherwise encumbered.

In reality, investors' assets were routinely margined, pledged, hypothecated, and sold short without investors' knowledge. The proceeds from the misuse of investor assets were used to fund a variety of different trading strategies, business expenses, personal expenses, and various business investments. Credit Bancorp's business investments were largely unprofitable and included an investment of over $1,000,000 in a hotel in the south of France, a $3,000,000 investment in the University of Southern Europe, and the purchase of a $600,000 yacht.

Credit Bancorp claimed to make money by engaging in a propriety investment strategy that took advantage of Credit Bancorp's unique relationships with European banking/institutional counterparts. Credit Bancorp claimed to use customer assets that were held in the credit facility program as collateral for intra-day trading strategies that had zero losses. This Court has found "the uncontested facts prove that [investors'] assets were not held in custodial accounts and investor securities were sold or margined." *SEC v. Credit Bancorp, Ltd.*, 195 F.Supp.2d 475, 492 (S.D.N.Y.2002).

Rittweger's official titles at Credit Bancorp were Managing Director, North America of Credit Bancorp, Ltd. and President of Credit Bancorp & Co. Rittweger was held out to investors as a licensed securities broker. Rittweger acted as the contact person between investors and Credit Bancorp in order to facilitate participating in the credit facility program.

Rittweger started his career with Credit Bancorp while he was working at Summit Financial Resources ("Summit"), primarily marketing Credit Bancorp's credit facility to the Summit clients that he managed. In late 1997, Rittweger became a salaried employee of Credit Bancorp as the Manag-

ing Director, North America at Credit Bancorp, Ltd.

Rittweger had a team of independent agents that hawked the credit facility program to investors and referred potential investors to Rittweger's office in Tom's River, New Jersey. By 1999, there were approximately 30 brokers reporting to Rittweger and approximately 75 contacts under his direction. Rittweger was responsible for and held sole discretion in compensating these independent agents.

While Blech in Geneva, Switzerland was responsible for the overall management of the company, Rittweger dealt with the day-to-day sales operations of Credit Bancorp, reporting to Blech at least a few times per week. Blech met with Rittweger personally on at least 9 separate occasions.

Rittweger was known within Credit Bancorp as being extraordinarily successful in marketing the credit facility.

Rittweger personally assured investors that their securities would not be transferred, disposed of, or otherwise encumbered. Additionally, Rittweger personally sent out the Credit Facility Agreement and the Letter of Engagement to investors.

Rittweger, in his capacity at Summit as well as at Credit Bancorp, frequently instructed investors to send their stock certificates, used as collateral in the credit facility, directly to his custody.

When stock certificates were sent to the "trustee," Brandon would forward them directly to Rittweger. Rittweger, then, would either send the physical securities to a depository institution by courier or, more frequently, personally deliver the securities to the depository institution.

In addition to a yearly salary, Rittweger was paid a 3% commission per year on each credit facility transaction he brought in based on the asset value of the transac-

tion. In 1998 and 1999, Rittweger received $200,000 in salary and over $2,765,000 in commissions.

Rittweger controlled a "Credit Bancorp" check account at Commerce Bank, which was used to receive his commission payments, compensate brokers, distribute dividends to customers, and fund expenditures needed to maintain the Tom's River office. In contravention of two orders to provide records of this account, Rittweger has failed to provide any documentation of his accounts.

Upon Commerce Bank providing the necessary information, the account summary for the CBL checking account showed $10,691,760 deposited through the period of Rittweger's financial scheme. Of that amount, distribution of dividends to customers amounted to $1,675,166. Numerous transfers were also conducted to a second CBL-controlled account held at Bank of America in San Diego, California, amounting to $689,254. After these deductions, Rittweger had sole discretion at the use of the remaining $8.4 million. The CBL Commerce Bank account statements indicated personal use of the account by Rittweger, including numerous ATM transactions, as well as purchases at Victoria's Secret, Home Depot, Toys R Us, Radio Shack, various jewelry stores, and Barnes & Noble.

On November 12, 1999, Rittweger transferred $500,000 from the CBL Commerce Bank account into a separate checking account filed under the names of Rittweger and his wife (also held at Commerce Bank). Although the November 1, 1999 Court Order froze all CBL assets and personal assets of Rittweger, he then transferred the $500,000 into a third account held under only his wife.

On November 29, 1999, Rittweger transferred an additional $100,000 from the CBL checking account into a newly opened

account at Summit Bank under his wife's name.

Rittweger maintained a second account at Salomon Smith Barney in Tom's River, NJ. This account was also opened under the name of Credit Bancorp and was used by Rittweger for the explicit purpose of receiving commissions. Through three transactions, Rittweger transferred a total of $200,000 from the CBL Commerce Bank account into the Salomon Smith Barney account. Rittweger then transferred the $200,000, plus an additional $41,000 from securities transactions, from this account to a series of accounts held by Rittweger's wife.

As a companion account to the CBL Commerce Bank account, Rittweger also maintained a brokerage account at Commerce Capital Markets. Rittweger transferred 400,941 shares of FiNet Holdings to an unknown destination. These shares were valued at approximately $886,000.

Although Rittweger not only maintained the CBL Commerce Bank account for commissions and expenses but also controlled the CBL Salomon Smith Barney account solely to handle commission payments, he also claims to have received commission payments through a third account. During the time of the financial scheme at CBL, Rittweger received at least three commission payments in an account at Coutts Bank in Switzerland held by "Tower Financial, Ltd.," an entity registered under the name of Rittweger's wife. Rittweger's counsel stated that Rittweger had transferred $800,000 from a Tower Financial Account in Switzerland to pay his long-overdue taxes and purchase a piece of recreational property. Rittweger claims the deposits to this account have come from various sources, but has provided no documentation to support his claim. The court order receiver approximates $650,000 to be attributable to CBL. While Rittweger has not provided documentation

to trace the exact amounts of the deposits, in January 2000, he transferred $926,063 to another account held under his wife's name.

The value of the assets transferred in violation of the Court Order freezing assets totals $2,653,063.

Rittweger made representations as described in the following findings. The Credit Bancorp Engagement letter from Brandon, one of two documents needed for the execution of a credit facility agreement, stated; "[o]nly I as trustee will have signatory or withdrawal power over the account under the terms of the Credit Facility. . . ." Of the 37 bank accounts that Credit Bancorp maintained, Brandon was the sole signatory on only one minor account. *Credit Bancorp*, 195 F.Supp.2d at 482. It became routine practice that when Brandon received instructions from a client regarding assets, the instructions would be forwarded on to Blech's office in Geneva with a copy also going to Rittweger's New Jersey office.

Rittweger explained to Glenn Hobin ("Hobin") that the role of the trustee was to protect the safety of the investors' assets. Further, Rittweger explained to Hobin that in the event of a threat to the investors' assets, the trustee would act to aggressively protect the assets on behalf of the client. Rittweger also explained that the trustee would be able to return the assets to the client.

Rittweger opened a brokerage account with Pershing Investments, located in New Jersey, for Credit Bancorp. Blech acknowledged that Brandon was not a signatory on this, or to his knowledge, any other Credit Bancorp account.

In one particular transaction, the physical securities involved in the transaction were sent to Rittweger who forwarded them to Blech in Geneva. Blech intended

to deposit the shares into a trading account with Deutsche Bank, However, when Blech attempted to deposit the shares in Deutsche Bank, he was told that the bank would not be interested in extending a credit line against the stock. At this point, Blech contacted Rittweger and said he would have to deposit the shares in another account where there was no trustee and where they would only be under Blech's signature. In response, Rittweger told Blech to "[g]o do it we've got to get it done."

Rittweger represented to investors that securities and assets deposited with Credit Bancorp would not be transferred, disposed of, or otherwise encumbered.

Hobin stated that Rittweger provided him an explanation to help him understand the credit facility program. Further, based on representations made by Rittweger and others, Hobin understood that assets deposited into the credit facility program would be protected by a trustee and would not be placed at risk.

Rittweger stated to others at Credit Bancorp that he did not want investors to see account statements that indicated investors' securities were deposited in margin accounts.

Efforts to cover up the margining of investor assets included altering documents. Upon approval from Rittweger, account statements were scanned into a computer then altered to hide the fact that investor securities were placed in margin accounts. These altered statements were sent to Rittweger, who apparently passed them on to investors.

In February of 1999, Rittweger was involved in a meeting with Tasin & Company, a broker-dealer with whom Credit Bancorp had a large trading account. Credit Bancorp's trading account with Tasin & Company largely contained investors' assets of the credit facility brought in by Rittweger.

At the February meeting with Tasin & Company, Rittweger had a list of securities that Credit Bancorp wished to deposit in the Tasin & Company account and wanted to know what the margin value would be on those securities. Those securities would have been margined in the Tasin & Company account. Also discussed was the treatment that Credit Bancorp had received from Tasin & Company regarding previous margin calls on Credit Bancorp accounts.

Credit Bancorp used investor assets to establish option strategies. The option strategy basically put investors' securities as collateral to back transactions which consisted of the sale of investors' securities. The assets used for option strategies were mainly from clients of Rittweger.

Credit Lyonnais was Credit Bancorp's primary institution for providing option strategies. However, investors were not told about this arrangement with Credit Lyonnais. Blech discussed with Rittweger the use of the option trading strategy with Credit Lyonnais for stocks that were not marginable.

In one particular transaction, Rittweger was informed by Blech that the investor's stock was put into jeopardy by a margin call on a JP Morgan account where the shares were deposited. Rittweger and Blech contemplated ways to stall JP Morgan while they looked for ways to get other funds or securities into the account to cover the margin call. Eventually, shares of the investor's stock were liquidated by JP Morgan to cover the margin call. Rittweger discussed buying back shares, replacing those that had been liquidated, to return to the investor.

Rittweger was present for discussions in Credit Bancorp's Geneva trading room in which the trading of investors' assets was discussed. Specifically, the trading of Environmental Technologies, Inc. stock, Vitech

stock, and Praegitzer Industries stock were discussed.

Credit Bancorp claimed it would receive a determined market value for the securities held in its insured accounts. That value was used to engage in intra-day propriety trading strategies.

Rittweger explained part of the propriety investment strategy to Hobin by using the example of currency arbitrage which, according to Rittweger, took advantage of "the difference between buying and selling" resulting in profit. Rittweger further explained that riskless arbitrage allowed for profits to be locked in through certain transactions.

Blech overheard Rittweger speaking to representatives of a large potential investor about Credit Bancorp's propriety investment strategy. Rittweger stated that Credit Bancorp took advantage of its European banking arrangements and engaged in riskless arbitrage. According to Blech, this "had nothing to do with anything remotely close to what CBL's trained activities were."

Credit Bancorp retained the public relations firm Ruder Finn to help develop the image of the company and work on Credit Bancorp's marketing strategy. Part of this marketing strategy was the development of a marketing brochure for Credit Bancorp.

The Ruder Finn brochure stated that Credit Bancorp's "current book business" was $2 billion and expected to triple. Rittweger provided this information to Ruder Finn.

Rittweger told Hobin that he had closed a large deal with Mitsui Trust Bank ("Mitsui") and that Mitsui could now be used as a reference for potential investors.

Rittweger explained to Hobin the terms of using Mitsui as a reference. The Mitsui reference would be compensated a percentage of every transaction brought in using the Mitsui reference.

Rittweger stated as part of his sales pitch that Credit Bancorp had closed a $50 million deal with Mitsui. Mitsui never invested with Credit Bancorp.

Rittweger informed Blech that investors were concerned that Credit Bancorp was a foreign company and had foreign relationships. As such, Credit Bancorp represented to investors that assets would be held in U.S. banks or brokerage firms that carried a rating of AA or better.

Rittweger represented to Hobin that investor securities would be held in U.S. money centers. Credit Bancorp had numerous foreign bank accounts in which investor assets were deposited.

Steven Joffe ("Joffe") is the Chief Executive Officer and largest shareholder of LCA Vision, Inc. ("LCA"). The common stock of LCA is traded on the NASDAQ stock exchange under the symbol of LCAV.

In or around the summer of 1997, Joffe was contacted regarding Credit Bancorp's credit facility. The credit facility had been represented to Joffe as an opportunity to borrow money while using share certificates as collateral for the loan. In addition, Rittweger represented to Joffe that the value of the unencumbered shares would generate a dividend.

Rittweger discussed the transaction with Blech. Blech was concerned that the stock was not marginable, but discussed the possibility of using the stock in some sort of options trading strategy.

Rittweger, in his capacity as a registered representative of Summit, contacted Joffe and represented that he was "the contact between [Joffe] and Credit Bancorp in getting the [credit facility] deal accomplished." Soon thereafter, Rittweger, in his capacity with Credit Bancorp,

sent Joffe the Credit Facility Agreement and Letter of Engagement.

In September of 1997, Joffe agreed to invest approximately 2,850,000 shares of LCAV stock in the credit facility program in the form of 3 stock certificates of 950,-000 shares apiece. Joffe delivered the physical stock certificates to Rittweger. One stock certificate was deposited in Bankers Trust, a bank located in Monaco. An option-type transaction was started using the LCAV shares as collateral.

Shortly after delivering the shares, Joffe decided to terminate his relationship with Credit Bancorp. In early October of 1997, Joffe contacted Rittweger and demanded the return of his shares. Joffe met with Rittweger in person at a hotel in New York and stated that he wanted his shares back and that he wanted to terminate his relationship with Credit Bancorp. Rittweger replied that it would not be a problem to return the shares.

Subsequently, on or about November 3, 1997, Credit Bancorp returned only two of the three stock certificates Joffe had previously delivered to Credit Bancorp. Credit Bancorp did not return Joffe's third stock certificate, representing approximately 950,000 shares of LCAV stock. On November 3, 1997, Joffe faxed a written request to Rittweger demanding the return of the remaining 950,000 shares and threatening legal action against Credit Bancorp in the event of noncompliance. In response to Joffe's request, Credit Bancorp informed Joffe that his remaining shares had been misplaced and could not be returned at that time.

On December 29, 1997, Joffe received a letter from Credit Bancorp stating that his remaining shares had been located and were being held in a trust account at the Bank of New York.

On January 12, 1998, 490,000 shares of Joffe's LCAV stock were sold by JP Morgan to pay back an account deficit on Credit Bancorp's account,

Blech provided Rittweger and others with the account statements from JP Morgan indicating the sale of Joffe's LCAV stock. Blech discussed with Rittweger and others how they would buy back the shares that had been sold by JP Morgan. Rittweger suggested that Credit Bancorp send Joffe documentation indicating they were about to transfer 950,000 shares of LCAV to Joffe, yet at that time Credit Bancorp did not have these shares to transfer.

On April 1, 1998, Joffe received an unsolicited wire transfer from Credit Bancorp in the amount of $1,662,500. According to Credit Bancorp, this amount represented the value of Joffe's unreturned shares and was intended as compensation in lieu of an actual return of the shares. The monies used to pay Joffe came from Credit Bancorp funds, including the funds of other investors.

The stock price of LCAV had approximately halved from the time Joffe had requested the return of the shares to the time Credit Bancorp had sent the payment of $1,662,500. Joffe accepted the $1,662,500 payment as a loan and sent a contract to Credit Bancorp indicating such. Joffe had not received his shares back as of the commencement of this action.

In 1997, William St. Laurent ("St. Laurent") was the president and chief operating officer of Vitech America, Inc. ("Vitech"), a company based in Brazil with an office in Miami, Florida. At that time, Vitech was publicly traded on the NASDAQ stock exchange under the symbol VTCH. St. Laurent is also a general partner of Wolf Partners, LP ("Wolf"), which owned approximately 2.4 million shares of Vitech stock.

In the second half of 1997, Rittweger contacted St. Laurent about investing in Credit Bancorp's credit facility program. Rittweger outlined a program that would pay a six percent dividend on deposited securities.

St. Laurent suggested changing the language in the credit facility agreement to read, "[i]nsured Trustee will not at any time sell, trade, pledge, hypothecate, transfer or otherwise dispose of the Securities . . ." Rittweger assured St. Laurent that Credit Bancorp would abide by those restrictions.

Rittweger asked Blech if it would be a problem to include the modified language suggested by St. Laurent in the final credit facility agreement. Blech responded that it did not explicitly say margin so there would be some "wiggle room." Rittweger concurred.

St. Laurent originally declined Rittweger's credit facility proposal, but Rittweger persisted. Finally, in the beginning of 1998, St. Laurent invested 1,650,000 shares of Vitech stock, worth approximately $22 million, with Credit Bancorp. Rittweger had agreed to St. Laurent's suggested changes in the final credit facility agreement.

Rittweger instructed St. Laurent to split up the Vitech stock into four blocks of 412,500 shares each and deposit a block of shares into each of four different accounts. This request was based on a discussion between Rittweger and Blech deciding that splitting up the shares into four blocks would optimize the margin value of the stock. Rittweger further instructed St. Laurent to remove the restrictive legend on the shares prior to transferring them to Credit Bancorp.

St. Laurent's Vitech stock was margined in Credit Bancorp accounts located outside of the United States. An options trading strategy was established through Credit Lyonnais using St. Laurent's Vitech stock as collateral.

In July of 1998, St. Laurent noticed large volumes of Vitech stock in the market and contacted Rittweger expressing his concern that the shares may have "leaked" into the market and demanding the return of his securities.

In response to St. Laurent's request for the return of his shares, Rittweger assured St. Laurent that the shares were absolutely under Credit Bancorp's control and that he would start work on returning the shares.

On August 12, 1998, St. Laurent sent a letter to Rittweger and Brandon requesting the return of his shares, with the exception of 300,000 shares, to remain as collateral for a loan previously drawn against the shares.

St. Laurent spoke to Rittweger many times about getting his shares back. Rittweger was St. Laurent's "day-today" contact at Credit Bancorp.

St. Laurent's shares could not be returned because Credit Bancorp was short some shares and others were encumbered at the time of his request.

On August 13, 1998, Brandon sent a letter to St. Laurent stating Credit Bancorp was in the process of calculating the balance due on St. Laurent's account. Rittweger and Blech discussed this letter as being a delay tactic while they tried to unencuraber or buy back St. Laurent's shares. St. Laurent recognized this as a delay tactic.

Some of St. Laurent's Vitech shares were placed in Credit Bancorp accounts where Rittweger was the sole signatory on the account. Some of St. Laurent's shares were finally returned to St. Laurent from various sources over a long period of time. Rittweger and Blech were primarily responsible for orchestrating the return of

the shares. The trustee, Brandon, had little to no role in the actual return of the shares.

Charles Corey Stephenson, Jr. ("Stephenson") is chairman of the board for Vintage Petroleum Industries ("Vintage"), a company headquartered in Tulsa, Oklahoma. Vintage is a publicly traded company on the New York Stock Exchange under the symbol VPI.

In March of 1999, Stephenson was contacted by a representative from Sterling Capital about an investment opportunity with Credit Bancorp. Stephenson was told that Mitsui had made a $300 million dollar investment with Credit Bancorp.

In the summer of 1999, Stephenson entered into a credit facility agreement with Credit Bancorp and transferred approximately 8 million shares of Vintage to Credit Bancorp worth between $90 and $100 million. Rittweger received approximately $1.5 million in commissions on the Vintage transaction. Rittweger had part of his commissions wired to a personal offshore bank account, apparently for tax purposes.

Stephenson received a call from a newspaper reporter asking him if he was aware that some of his shares were tied up in a problem with Credit Bancorp. After receiving this call, Stephenson called Rittweger to request information. Stephenson was provided with redacted account statements from Credit Bancorp showing his shares in a variety of different accounts.

Blech discussed with Rittweger and others the transfer of Stephenson's shares from a Coutts Bank account to another Credit Bancorp account at Legg Mason. According to Blech, the reasoning for this transfer was because Coutts Bank was not interested in providing a good line of credit against Stephenson's stock while Legg Mason afforded more favorable trading investments and margin opportunities.

Stephenson requested the return of his Vintage stock from Credit Bancorp. His stock had not been returned to him as of the commencement of this action.

Rittweger did not submit an opposing statement challenging the facts set forth above.

No denial of the 67 numbered paragraphs was submitted. Rittweger, by letter of June 3, 1010, challenged facts based on Blech's testimony and cited statements by Blech which Rittweger asserted "undermine his trial testimony" and requested a jury trial. In a letter responding to the reply of the SEC dated June 21, 2010, Rittweger denied knowledge of Blech's fraud which Rittweger maintained was established only by Blech's testimony, Rittweger also challenged the propriety of his criminal conviction based on Blech's testimony.

### III. Rittweger's Motion for Declaratory Judgment is Denied

#### a. Declaratory Judgment Is Inappropriate

Rittweger's Motion for Declaratory Judgment is procedurally improper. A declaratory judgment is meant "to clarify and settle disputed legal relationships and to relieve uncertainty, insecurity, and controversy." *Broadview Chemical Corp. v. Loctite Corp.*, 474 F.2d 1391, 1393 (2d Cir.1973) (citing E. Borchard, *Declaratory Judgments* 299 (2d Ed. 1941)). A motion for declaratory judgment is inappropriate where, as here, a party has "already invoked its right to a coercive remedy." *Piven v. Wolf Haldenstein Adler Freeman & Herz LLP*, 2010 WL 1257326 at *11 (S.D.N.Y. March 12, 2010). Furthermore, declaratory judgment is inappropriate where the moving party seeks to adjudicate past conduct. *See Nat'l Union Fire Ins. Co. of Pittsburgh, PA. v. International Wire Group, Inc.*, 2003 WL 21277114 at

*5 (S.D.N.Y. June 2, 2003) ("There is no basis for declaratory relief where only past acts are involved.") (citing *Gianni Sport Ltd. v. Metallica,* 2000 WL 1773511 at *4 (S.D.N.Y. Dec. 4, 2000)).

### b. *The Civil Action Is Not Barred By The Criminal Prosecution*

■ "There is no general federal constitutional, statutory, or common law rule barring the simultaneous prosecution of separate civil and criminal actions by different federal agencies against the same defendant involving the same transactions." *SEC v. First Fin. Group of Texas, Inc.,* 659 F.2d 660, 666 (5th Cir.1981); *SEC v. Musella,* 1983 WL 1297 at *1, 1983 U.S. Dist. LEXIS 17999 at *2 (S.D.N.Y. April 4, 1983) ("It has long been recognized that the federal government may pursue civil and criminal actions, arising out of the same operative facts, either 'simultaneously or successively.'") (*quoting Standard Sanitary Manufacturing Co. v. United States,* 226 U.S. 20, 52, 33 S.Ct. 9, 57 L.Ed. 107 (1912); *United States v. Kordel,* 397 U.S. 1, 11, 90 S.Ct. 763, 25 L.Ed.2d 1 (1970)). "Parallel civil and criminal proceedings instituted by different federal agencies are not uncommon occurrences because of the overlapping nature of federal civil and penal laws." *First Fin. Group,* 659 F.2d at 666–67; *see also SEC v. Palmisano,* 135 F.3d 860, 865 (2d Cir.1998) ("'Congress may impose both a criminal and a civil sanction in respect to the same act or omission'") (*quoting United States v. Ursery,* 518 U.S. 267, 292, 116 S.Ct. 2135, 135 L.Ed.2d 549 (1996)). "The simultaneous prosecution of civil and criminal actions is generally unobjectionable because the federal government is entitled" to protect the separate interest of different federal agencies at the same time. *First Fin. Group,* 659 F.2d at 667.

Rittweger's assertion that the Commission's action is barred because of his criminal conviction is without merit.

### c. *The Remedies Sought By The Commission Do Not Violate The Double Jeopardy Clause Of The Fifth Amendment*

■ Rittweger has also asserted that the remedies sought by the Commission violate the Double Jeopardy Clause of the Fifth Amendment. However, "[t]he [Double Jeopardy] Clause protects only against the imposition of multiple *criminal* punishments for the same offense." *Hudson v. United States,* 522 U.S. 93, 99, 118 S.Ct. 488, 139 L.Ed.2d 450 (1997) (emphasis in original); *see also Palmisano,* 135 F.3d at 864. Thus, for the SEC's suit to violate Rittweger's Fifth Amendment rights, the punishment the SEC seeks must be criminal.

"Whether a particular punishment is criminal or civil is, at least initially, a matter of statutory construction." *Id.* The Supreme Court has created guidelines to assist courts in determining if a purported civil penalty functions as a criminal penalty. *Hudson,* 522 U.S. at 99–100, 118 S.Ct. 488. In doing so, the Court noted that "all civil penalties have some deterrent effect" and if a civil sanction was required to be "'solely' remedial (i.e., entirely nondeterrent) ... then no civil penalties are beyond the scope of the [Double Jeopardy] Clause." *Id.* at 102, 118 S.Ct. 488.

A line of cases have applied these guidelines and found that disgorgement, Commission penalties, and injunctions are civil penalties, and thus do not violate the Double Jeopardy Clause. *Palmisano,* 135 F.3d at 865–66 ("Congress's intent clearly favors classifying disgorgement and the fines at issue here as civil."); *United States v. Van Waeyenberghe,* 481 F.3d 951, 958–59 (7th Cir.2007) ("[Defendant] offers little to no analysis under *Hudson* as to why the injunction, disgorgement, and restitution required of him are anything other than equitable remedies that present no

bar to subsequent criminal prosecution."); *United States v. Tommassello*, 178 Fed. Appx. 139, 139 (3rd Cir.2006) (unpublished decision) ("The permanent injunction against Tommassello in the SEC action is not a criminal punishment and did not trigger the protections of the Double Jeopardy Clause.").

"[O]nly the clearest proof will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty." *Hudson*, 522 U.S. at 100, 118 S.Ct. 488 (1997) (citation omitted). Rittweger has not established such proof.

■ The authorities that establish the Commission remedies are not criminal penalties require dismissal of Rittweger's motion. *United States v. Perry*, 152 F.3d 900, 904 (8th Cir.1998) ("We join [the Second Circuit] and the several other circuits that have held that the SEC disgorgement remedies are not criminal punishments.").

### d. *The Remedies Sought By The SEC Are Appropriate*

■ "Once the district court has found federal securities law violations, it has broad equitable power to fashion appropriate remedies." *SEC v. First Jersey Securities, Inc.*, 101 F.3d 1450, 1474 (2d Cir. 1996). The Commission has sought the following remedies against Rittweger: (i) a permanent injunction against future violations of the federal securities laws; (ii) disgorgement and prejudgment interest; (iii) and a civil monetary penalty.

■ Section 20(b) of the Securities Act and Section 21(d)(1) of the Securities Exchange Act grant to the Commission the authority to seek injunctive relief when it appears, upon proper showing, "that any person is engaged or about to engage in any acts or practices which constitute or will constitute a violation of the provisions [of the Acts]." 15 U.S.C. § 77t(b); 15 U.S.C. § 78u(d)(1) (containing substantial-

ly similar language). An enforcement action requesting a permanent injunction must only show a "reasonable likelihood of future violations." *CFTC v. Hunt*, 591 F.2d 1211, 1220 (7th Cir.1979) (citing *SEC v. Advance Growth Capital Corp.*, 470 F.2d 40, 54 (7th Cir.1972)).

■ The "district court has broad discretion to enjoin possible future violations of law where past violations have been shown." *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1100 (2d Cir.1972). Factors that courts have considered include: "the degree of scienter involved, the sincerity of defendant's assurances against future violations, the isolated or recurrent nature of the infraction, defendant's recognition of the wrongful nature of his conduct, and the likelihood, because of defendant's professional occupation, that future violations might occur." *SEC v. Universal Major Indus. Corp.*, 546 F.2d 1044, 1048 (2d Cir.1976); *Manor Nursing Ctrs.*, 458 F.2d at 1100–1101. "[P]ast illegal conduct is highly suggestive of the likelihood of future violations." *SEC v. Mgmt. Dynamics*, 515 F.2d 801, 807 (2d Cir.1975).

■ It is well settled that the Commission may seek, and the courts may order, disgorgement of ill-gotten gains in Commission injunctive actions. *Manor Nursing Ctrs.*, 458 F.2d at 1104; *SEC v. Rind*, 991 F.2d 1486, 1493 (9th Cir.1993). Disgorgement is an appropriate equitable remedy and within the discretion of the district court to adopt. *SEC v. Patel*, 61 F.3d 137, 139–140 (2d Cir.1995). The purpose of the disgorgement remedy is not to compensate the victims of a fraud; it is to deprive the wrongdoer of his ill-gotten gains. *SEC v. Bear, Stearns & Co., Inc.*, 626 F.Supp.2d 402, 406 (S.D.N.Y.2009). The decision of whether to order prejudgment interest, like the decision to grant disgorgement and in what amount, is left

to broad discretion of this court. *First Jersey Sec.,* 101 F.3d at 1476.

■ The Commission seeks $18,128,599.40 in disgorgement from Rittweger. Rittweger has been ordered to pay this amount in restitution in the criminal case. To the extent that Rittweger has paid or pays the amount owed in restitution, the amount of his disgorgement obligation may be offset accordingly. *See SEC v. Opulentica,* 479 F.Supp.2d 319, 331 (S.D.N.Y.2007); *Palmisano,* 135 F.3d at 864.

■ Pursuant to Section 20(d)(2) of the Securities Act and Section 21(d)(3) of the Securities Exchange Act, the Commission may seek civil penalties for violations of the federal securities laws. 15 U.S.C. § 77t(d)(2); 15 U.S.C. § 78u(d)(3) The "House Report on the Penalty Act made clear ... 'that authority to seek or impose substantial money penalties, in addition to the disgorgement of profits, is necessary for the deterrence of securities law violations.'" *SEC v. Moran,* 944 F.Supp. 286, 296 (S.D.N.Y.1996) (*quoting* H.R.Rep. No. 101–616, 101st Cong., 2d Sess., reprinted in 1990 U.S.Code Cong. & Admin. News 1379, 1384–86). The decision whether to impose civil penalties and the amount depends on each case's "own particular facts and circumstances" and is ultimately at the discretion of the court. *Moran,* 944 F.Supp. at 297.

■ The courts look to the same factors in imposing civil penalties as in the issuance of a permanent injunction. *SEC v. Brethen,* 1992 WL 420867 at *25, 1992 U.S. Dist. LEXIS 20665 at *104 (S.D.Ohio Oct. 15, 1992). In deciding the amount of the civil penalty, the court should analyze "(1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was iso-

lated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition." *SEC v. Credit Bancorp, Ltd.,* 2002 WL 31422602 at *3, 2002 U.S. Dist. LEXIS 20597 at *9–10 (S.D.N.Y. Oct. 29, 2002). *See also Official Committee of Unsecured Creditors of WorldCom, Inc.,* 467 F.3d 73, 81 (2d Cir. 2006); *Bear, Stearns,* 626 F.Supp.2d at 407; *SEC v. Rabinovich & Assocs., LP,* 2008 WL 4937360 at *6, 2008 U.S. Dist. LEXIS 93595 at *18 (S.D.N.Y. Nov. 18, 2008).

■ Rittweger's current and future financial situation precludes imposing a penalty. Rittweger has filed for bankruptcy and is currently incarcerated. Although he is scheduled for release from prison at age 56, it is unlikely that he will accomplish funds such that paying a civil penalty would be practicable. Furthermore, the Court finds that the penalties of disgorgement, criminal restitution, incarceration, and injunction against future violations imposed on Rittweger are sufficient to deter future illegal conduct. A further penalty at this time is inappropriate. *See, e.g., SEC v. Patel,* 1994 WL 364089 at *3–4, fn. 4, 1994 U.S. Dist. LEXIS 9479 at *9–11, fn. 4 (S.D.N.Y. July 12, 1994), aff'd in part, rev'd in part on other grounds, 61 F.3d 137 (2d Cir.1995) (finding that the defendant had already suffered sufficiently through felony conviction, incarceration, criminal fine, disgorgement, and civil settlements to accomplish the goal of deterrence and declining in its discretion to impose an additional civil penalty); *SEC v. Mellert,* 2006 WL 927743 at *1–2, 2006 U.S. Dist. LEXIS 14070 at *3–4 (N.D.Cal. Mar. 28, 2006) (imposing no civil penalty where the court found that the imposition of such a penalty was not necessary to accomplish goal of deterrence in light of criminal fine, incar-

ceration, and Defendant's relatively less egregious criminal conduct).

#### IV. *Plaintiff's Motion for Summary Judgment is Granted*

##### a. *The Summary Judgment Standard*

■■■■ Rule 56(c) of the Federal Rules of Civil Procedure provides that a court shall render summary judgment when the moving party demonstrates that "there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c)(2). Where the only issues remaining concern the legal consequences of undisputed facts, summary judgment is appropriate. *Fitzsimmons v. Greater St. Louis Sports Enters., Inc.,* 63 F.R.D. 620, 622 (S.D.Ill.1974). Summary judgment has been deemed an appropriate resolution for actions brought by the Commission alleging fraudulent conduct in violation of federal securities laws. *SEC v. Dimensional Entm't Corp.,* 493 F.Supp. 1270, 1274 (S.D.N.Y.1980) (stating "in an SEC action seeking injunctive relief, the court should not hesitate to grant a request for summary judgment if the defendant fails to demonstrate that there is a genuine issue for trial"); *see also SEC v. Research Automation Corp.,* 585 F.2d 31, 33–35 (2d Cir.1978).

Once the SEC has established there are no genuine issues of material fact, the burden shifts to Rittweger to produce evidence showing a genuine issue remains, thus requiring resolution at trial. *United States v. An Antique Platter of Gold,* 991 F.Supp. 222, 228 (S.D.N.Y.1997); *Glazer v. Formica Corp.,* 964 F.2d 149, 154 (2d Cir. 1992). To survive a motion for summary judgment, Rittweger must make an affirmative showing of specific issues sufficient to establish that a genuine dispute of material fact remains. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S.

574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

A genuine dispute requires more than a "metaphysical doubt." *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (citations omitted).

Upon that showing, the nonmoving party must "go beyond the pleadings and by ... affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (*quoting* Fed.R.Civ.P. 56(e)). *See also Alhovsky v. Ryan, et al.,* 658 F.Supp.2d 526, 531 (S.D.N.Y.2009) (The nonmoving party must present "specific facts showing that there is a genuine issue for trial.") (*quoting* Fed.R.Civ.P. 56(e)). The party opposing summary judgment "may not rely on conclusory allegations or unsubstantiated speculation," *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998), The Second Circuit has determined the non-moving party cannot "escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts, or defeat the motion through mere speculation or conjecture." *Western World Ins. Co. v. Stack Oil, Inc.,* 922 F.2d 118, 121 (2d Cir. 1990) (citations omitted). Summary judgment should be entered for the moving party "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348.

■■■■ Rittweger did not controvert any of the facts set forth in the SEC's Statement of Undisputed Facts. His response consisted of his conclusory and argumentative assertions with respect to Blech's

testimony and failed to give citations to admissible evidence. *See, e.g., Wright–Jackson v. HIP Health Plan,* 2010 WL 624993 at *7, 2010 U.S. Dist. LEXIS 14751 at *18 (S.D.N.Y.2010). Summary judgment is appropriate here because Rittweger failed to meet his burden by not providing sufficient evidence to refute or call into question the facts the Commission previously set forth.

b. ***Rittweger Violated The Antifraud Provisions Of Section 17(a) Of The Securities Act, Section 10(b) Of The Securities Exchange Act, and Rule 10b–5 Thereunder***

■ Rittweger made material misrepresentations directly to prospective and existing customers of Credit Bancorp, Ltd. and Credit Bancorp, Inc. (collectively, "Credit Bancorp") to lure them into a massive Ponzi scheme, in which at least $90 million in investor funds were misappropriated. Rittweger's actions constituted violations of Section 17(a), Section 10(b), and Rule 10b–5. Rittweger's singular claim that these facts "are now in dispute" is unfounded because the lawsuit on which he bases his claim was previously dismissed with prejudice. Summary judgment is proper because Rittweger failed to produce sufficient evidence to show he did not violate Section 17(a), Section 10(b), and Rule 10b–5, or that a genuine issue exists respecting these facts.

Rittweger's fraudulent statements included: (i) Credit Bancorp would keep investors' assets in custodial accounts in which defendant Brandon would serve as trustee and have signatory or withdrawal power over the account, when in fact Brandon was the signatory on only one minor Credit Bancorp account; (ii) investors' assets would not be transferred, disposed of, or otherwise encumbered, when in fact assets were routinely margined, sold, and placed at risk; (iii) Credit Bancorp earned money through "risk-less arbitrage" trans-

actions with European financial institutions, when in fact, no such transactions existed; (iv) Rittweger falsified the amount of money that had been invested with Credit Bancorp; (v) Credit Bancorp had engaged in a large transaction with Mitsui Trust Bank, when in fact no such transaction had taken place; and (vi) investor assets would be held in U.S. custodial banks or brokerage accounts, when in fact they were often held in foreign bank and brokerage accounts.

In its Memorandum, the Commission provided the factual and legal bases to establish that Rittweger's conduct constituted egregious violations of Section 17(a). The SEC has established that Rittweger used the means and instrumentalities of interstate commerce in connection with fraud, acted in connection with the sale of securities, made material misstatements, had the requisite scienter, and is collaterally estopped from relitigating Credit Bancorp's fraudulent conduct and his own knowledge of and participation therein because of his criminal convictions.

Rittweger provided no evidence to refute or call into question the fact that he made material misrepresentations to several investors that resulted in multiple egregious violations of Section 17(a), Section 10(b), and Rule 10b–5. Rather than providing the affirmative showing of specific issues the law requires, Rittweger, in his Letter, made a single broad claim in attempting to create a genuine issue of material fact; that the facts "are now in dispute" because his codefendant, Blech, sued the court appointed receiver, Carl H, Loewenson, Jr. in the Netherlands Antilles.

Blech's case was dismissed with prejudice on May 17, 2010 based upon the fact that it was time-barred. Blech's case was Rittweger's only basis for stating the "facts are in dispute." Since Blech's case

was dismissed with prejudice for being meritless, Rittweger's claim is now groundless. Beyond this groundless claim, Rittweger made no further attempt to affirmatively show specific issues sufficient to establish that he did not violate Section 17(a), Section 10(b), and Rule 10b–5.

Even if Blech's case had not been dismissed, Rittweger's claim is not an affirmative showing of specific issues sufficient to raise a genuine issue of material fact as to whether the SEC was wrong in determining Rittweger violated securities laws. *See Matsushita,* 475 U.S. at 585–86, 106 S.Ct. 1348. Rittweger's claim that Blech said the "U.S. [sic] Attorney coerced and threatened [Blech] into testifying against [Rittweger]" is nothing more than an unsubstantiated allegation.

Even if Rittweger were correct, and Blech's criminal trial testimony contained inaccuracies, there is ample independent evidence in the SEC's Statement of Undisputed Facts to provide a basis for summary judgment. The testimony of the investors, Stephen Joffe, William St. Laurent, and Charles Stephenson all provide an independent evidentiary foundation for the SEC's motion. The bank records for his Credit Bancorp and Commerce Capital Markets accounts also provide an independent record for his federal securities law violations.

Rittweger's unsupported contention does not establish that his criminal conviction for securities fraud was improper. Accordingly, the claim provides no independent facts that affect the outcome of this action because it does not establish that the Commission erred in determining Rittweger violated securities laws. *See General Elec. Co. v. N.Y. State Dept. of Labor,* 936 F.2d 1448, 1452 (2d Cir.1991) (*quoting Anderson,* 477 U.S. at 248, 106 S.Ct. 2505).

Rittweger's claims fail to rise to the affirmative showing of specific facts sufficient to establish that he did not violate Section 17(a), Section 10(b), and Rule 10b–5 and no genuine issue of material exists.

### c. *Rittweger Is Collaterally Estopped*

■ Rittweger makes no attempt to dispute the SEC's claim that he is collaterally stopped from relitigating the facts which underlie his criminal conviction. In a civil case, a defendant cannot controvert facts that were established in a previous criminal conviction based on the same facts. "It is well established that a prior criminal conviction may work an estoppel in favor of the Government in a subsequent civil proceeding" as long as the issues in the civil litigation were "distinctly put in issue and directly determined in the criminal prosecution." *Emich Motors Corp. v. Gen. Motors Corp.,* 340 U.S. 558, 568–69, 71 S.Ct. 408, 95 L.Ed. 534 (1951) (*quoting Frank v. Mangum,* 237 U.S. 309, 334, 35 S.Ct. 582, 59 L.Ed. 969 (1915) (internal quotations and citations omitted)); *see also United States v. Greater N.Y. Live Poultry Chamber of Commerce,* 53 F.2d 518 (S.D.N.Y.1931), aff'd sub nom. *Local 167 v. United States,* 291 U.S. 293, 54 S.Ct. 396, 78 L.Ed. 804 (1934); *United States v. Meyerson,* 24 F.2d 855, 856 (S.D.N.Y.1928).

■ When a criminal court finds against a party in favor of the United States, the facts upon which that conviction was based are firmly set as conclusive and may not be denied. *International Bhd. of Teamsters v. United States,* 291 U.S. 293, 298–99, 54 S.Ct. 396, 78 L.Ed. 804 (1934); *see also United States v. Greenberg,* 237 F.Supp. 439, 441–42 (S.D.N.Y.1965). In *International Bhd. of Teamsters,* the civil complaint alleged facts on which a previous criminal prosecution and conviction were based, 291 U.S. at 298, 54 S.Ct. 396. The defendants denied the allegations in their civil answer, despite the fact they had previously been criminally convicted on the same facts the civil

complaint alleged. *Id.* at 298–99, 54 S.Ct. 396. The U.S. Supreme Court determined that the defendants could not deny, in their civil answer, facts that were established in their previous criminal conviction, and that the defendants' attempt to deny these facts was "false and sham and the district court rightly so treated them." *Id.* Relying on *International Bhd. of Teamsters* and *Emich Motors Corp.*, this Court held, in *Greenberg,* that plaintiff United States could "rely upon the prior [criminal] judgment of conviction of defendant after trial to establish the issues relevant to this case which were necessarily determined by the conviction." 237 F.Supp. at 442.

The Complaint, Original Indictment, and Superseding Indictment all allege Rittweger (i) made misrepresentations and omissions of material facts in connection with the offer and sale of securities; (ii) participated in the fraudulent offer and sale of the Credit Bancorp insured credit facility; (iii) made material misrepresentations to investors regarding the placement of securities in custodial accounts, that funds were used to pay earlier investors, and that funds were used for unauthorized personal and business expenditures; and (iv) represented that Credit Bancorp had conducted more than one billion dollars in transactions since 1991 and that Credit Bancorp made money through riskless arbitrage conducted by unnamed foreign financial institutions. Additionally, the Complaint, Original Indictment, and Superseding Indictment all identify three specific transactions in which Rittweger and others fraudulently obtained securities through false statements to investors. Rittweger was convicted on all thirteen counts contained in the Superseding Indictment, was sentenced to 135 months imprisonment followed by three years of supervised probation, and ordered to pay $18,127,829,42 in restitution.

Courts regularly find that, where the criminal action supersedes the resolution of the SEC's enforcement action, a defendant is collaterally estopped from relitigating issues in the civil forum. *See SEC v. David I. Namer,* 183 Fed.Appx. 120, 121 (2d Cir.2006) ("we conclude that the District Court properly granted partial summary judgment after determining that Namer was collaterally estopped from relitigating the liability issues presented during the course of his criminal trial and conviction"); *SEC v. Glantz,* 2009 WL 3335340 at *4, 2009 U.S. Dist. LEXIS 95350 at *11 (S.D.N.Y.2009) ("Accordingly, so long as Glantz's conviction by guilty plea establishes the requisite elements of securities fraud, Glantz is estopped from challenging his liability under Section 10(b) and Rule 10b–5 of the Exchange Act and Section 17(a) of the Securities Act"); *Opulentica,* 479 F.Supp.2d at 326 ("Sheikh was convicted by guilty plea on securities fraud charges related to the same activities at issue here. Thus, all questions of fact material to and underlying Sheikh's criminal conviction, as established during the plea allocution, bind Sheikh in this subsequent civil action"); *SEC v. Freeman,* 290 F.Supp.2d 401, 405 (S.D.N.Y.2003) ("It is settled that a party in a civil case may be precluded from relitigating issues adjudicated in a prior criminal proceeding and that the Government may rely on the collateral estoppel effect of the conviction in support of establishing the defendant's liability in the subsequent civil action"). It is of no moment whether the criminal defendant's conviction arises out of a plea allocution or a trial, *SEC v. Roor,* 2004 WL 1933578 at *6–7, 2004 U.S. Dist. LEXIS 17416 at *22–23 (S.D.N.Y.2004) (granting summary judgment in a SEC enforcement action based on collateral estoppel following defendant's guilty plea); *Opulentica,* 479 F.Supp.2d at 326. "Whether established at plea allocution or at trial, all facts

material to the conviction bind the criminal defendant in later civil litigation." *SEC v. McCaskey*, 2001 WL 1029053 at *3, 2001 U.S. Dist. LEXIS 13571 at *9 (S.D.N.Y. 2001).

Rittweger cannot deny these facts in the instant civil action. *See Emich Motors Corp.*, 340 U.S. at 568–69, 71 S.Ct. 408; *International Bhd. of Teamsters*, 291 U.S. at 298–99, 54 S.Ct. 396; *Greenberg*, 237 F.Supp. at 441–42; *Greater N.Y. Live Poultry Chamber of Commerce*, 53 F.2d at 518; *Meyerson*, 24 F.2d at 856. Rittweger has provided no specific evidentiary basis to controvert the Commission's facts. Accordingly, the facts are established, there is no genuine issue of material fact, and Rittweger is collaterally estopped from re-litigating these issues.

### Conclusion

Based on the facts and conclusions set forth above, Rittweger's Motion for Declaratory Judgment is denied in whole and the SEC's Motion for Summary Judgment is granted, but denied as to the imposition of a further penalty.

Submit judgment on notice.

It is so ordered.

### OPINION

Defendant Thomas Rittweger ("Defendant" or "Rittweger") sent a letter to the Court dated August 10, 2010. In his letter, Rittweger contends that the recent U.S. Supreme Court decision in *Morrison v. Australia National Bank Ltd.*, — U.S. ——, 130 S.Ct. 2869, 177 L.Ed.2d 535 (2010), requires that the Court grant his motion for declaratory judgment and deny Plaintiff's motion for summary judgment. Defendant misconstrues *Morrison*. This Court's September 13, 2010 opinion denying Defendant's motion of declaratory judgment and granting Plaintiff's motion for summary judgment is not altered by the decision in *Morrison*.

### Discussion

*Morrison* addresses the extraterritoriality of the Exchange Act in the context of purchasers of Australian securities of an Australian bank suing that bank for securities fraud involving the purchase of an American company. *Id.* at 2875–6. The plaintiffs brought suit under Rule 10b–5, promulgated under § 10(b) of the Exchange Act. *Id.* at 2881. The Court held that § 10(b) did not apply extraterritorially to the defendants' conduct. *Id.* at 2883. Furthermore, the Court held that fraudulent statements made in the United States are not enough to trigger the application of § 10(b) to otherwise foreign transactions. *Id.* at 2883–4. Rather, the Court found that the "focus of the Exchange Act is not upon the place where the deception originated, but upon purchases and sales of securities in the United States." *Id.* at 2884. The Court summarized its holding by stating that "Section 10(b) reaches the use of a manipulative or deceptive device or contrivance only in connection with the purchase or sale of a security listed on an American stock exchange, and the purchase or sale of any other security in the United States." *Id.* at 2888.

Rittweger argues that because Blech's purchases and sales in Europe were the actual fraud in this case, § 10(b) does not apply to Rittweger's conduct. This contention is unavailing, as *Morrison* states that § 10(b) applies to securities transactions in the United States or transactions involving securities listed on an American exchange, both of which are present here. *Morrison*, 130 S.Ct. at 2888.

According to the SEC's Statement of Undisputed Facts, Rittweger, based in Toms River, New Jersey, marketed and sold Credit Bancorp's "Insured Credit Facility Program" to American investors, including Steven Joffe, William St. Laurent, and Charles Stephenson, Jr., *S.E.C. v.*

*Credit Bancorp,* 738 F.Supp.2d 376, at 385, 386, 388, 2010 WL 3582906, at *8, *9, *10 (S.D.N.Y. Sept. 13, 2010). He also sent American investors the Credit Facility Agreement and Letter of Engagement and received from them, either directly or indirectly, their stock certificates to be used as collateral under the Insured Credit Facility Program. *Id.* at 382, 385–86, at *4, *8. This exchange served as the transaction through which investors joined the Insured Credit Facility Program. Furthermore, Rittweger held out to domestic investors that their assets would be held in U.S. banks and brokerage firms. *Id.* at 385, at *8. Plainly, the transactions of securities through which domestic investors entered the Insured Credit Facility Program at Credit Bancorp took place within the United States.

Furthermore, with the investments of Steven Joffe, William St. Laurent, and Charles Stephenson, Jr., the securities which were transferred into Credit Bancorp's possession were, at least in these cases, securities on American stock exchanges. *Id.* at 386, 387, 388, at *8, *9, *10. Rittweger does not suggest that other securities he brought into the Insured Credit Facility Program were not also listed on domestic exchanges.

Therefore, the transactions for which Rittweger was prosecuted and sued satisfied both approaches to the application of § 10(b) under *Morrison:* they involved a securities transaction occurring domestically, and they involved the exchange of securities listed on domestic exchanges.

In light of the foregoing, Defendant's derivative Constitutional arguments under Separation of Powers and the Due Process Clause are meritless.

*Conclusion*

For the foregoing reasons, the Court's September 13, 2010 opinion granting Plaintiff's motion for summary judgment and denying Defendant's motion for declarato-ry judgment is unaffected by the Supreme Court's decision in *Morrison.*

It is so ordered.